## SHATTUCK v. GUARDIAN TRUST CO. OF NEW YORK.

(Supreme Court, Appellate Division, First Department.   July 7, 1911.)

1. BANKS AND BANKING (§ 154*)—PAYMENT OF DEPOSITS ON FORGED CHECKS —LIABILITY—AFFIRMATIVE DEFENSE.

A defense under Negotiable Instruments Law (Consol. Laws 1909, c. 38) § 326, providing that no bank shall be liable to a depositor for the payment by it of a forged check unless, within one year after the return to the depositor of the voucher of such payment, he shall notify the bank that the check was forged, must be pleaded and proved to be available, and the provision is not a condition precedent to be pleaded as a part of a cause of action by a depositor, suing his bank for a deposit depleted by the payment of forged checks, but is in effect a statute of limitations.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 502–533; Dec. Dig. § 154.*]

2. BANKS AND BANKING (§ 148*)—PAYMENT OF DEPOSITS ON FORGED CHECKS —DEFENSES.

A corporation made a deposit with a trust company, organized under the banking law, payable only on checks signed by the president and treasurer. The president forged the signature of the treasurer and obtained the deposit on such forgery. The president left the passbook with the company to be balanced, and the passbook, when balanced, and the vouchers, were returned to him. The president delivered the passbook to the treasurer, who made inquiries of the secretary of the company of the way in which the money had been drawn, and was informed that it had been drawn by the president on checks. *Held* to show such a delivery of the vouchers to the corporation as to set in operation Negotiable Instruments Law (Consol. Laws 1909, c. 38) § 326, providing that no bank shall be liable to a depositor for the payment of forged checks, unless, within a year after the return to the depositor of the voucher of payment, he shall notify the bank that the check was forged.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 443, 444; Dec. Dig. § 148.*]

3. BANKS AND BANKING (§ 116*)—NOTICE TO OFFICERS OR AGENTS.

In an action by the receiver of a corporation which had deposited money with a trust company, organized under the banking law, subject to payment on checks signed by the president and treasurer of the corporation, for the deposit paid by the trust company on forged checks, a conversation with a director of the trust company and a member of its executive committee and one of the regular attorneys for the company, importing notice to him of the payment by the trust company of the deposit on forged checks, was incompetent to bind the company in absence of a showing that the director acted for the company in the matter or communicated the information to the company.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 282–287; Dec. Dig. § 116.*]

4. CORPORATIONS (§ 428*)—NOTICE TO BOARD OF DIRECTORS.

Though notice to the board of directors of a corporation is notice to the corporation, notice to a director, who is a member of the executive committee, but not communicated to the board, is not notice to the corporation.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1748–1761; Dec. Dig. § 428.*]

5. BANKS AND BANKING (§ 148*)—PAYMENT OF DEPOSITS ON FORGED CHECKS —NOTICE—REQUISITES.

Under Negotiable Instruments Law (Consol. Laws 1909, c. 38) § 326, providing that no bank shall be liable to a depositor for the payment of a forged check unless, within a year after the return to the depositor of

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

the voucher of payment, he "shall notify the bank" that the check was forged, a real notice, addressed to the officers having authority to receive it, is essential.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. § 443; Dec. Dig. § 148.*]

6. CORPORATIONS (§ 428*)—NOTICE TO INDIVIDUAL DIRECTORS.

The directors of a corporation are not individually its agents for the transaction of the ordinary business usually delegated to its executive officers, and notice to the directors, assembled as a board, is alone notice to the corporation.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1748–1761; Dec. Dig. § 428.*]

7. BANKS AND BANKING (§ 154*)—PAYMENT OF DEPOSITS ON FORGED CHECKS —ACTIONS BY DEPOSITORS—DEFENSES.

Under Code Civ. Proc. § 500, requiring an answer to contain a statement of any new matter constituting a defense, an answer, in an action by a depositor for a deposit paid on forged checks, which alleges the making of the deposit, the drawing of checks, the delivery to the depositor of the balanced passbook with the checks, and which alleges that no objection to the account was made until after the expiration of a year, etc., states facts constituting a defense under Negotiable Instruments Law (Consol. Laws 1909, c. 38) § 326, providing that no bank shall be liable to a depositor for the payment of a forged check unless, within one year after the return to the depositor of the voucher of payment, he shall notify the bank that the check was forged.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 502– 533; Dec. Dig. § 154.*]

Ingraham, P. J., and McLaughlin, Scott, and Dowling, JJ., dissenting in part.

Appeal from Trial Term, New York County.

Action by Edwin P. Shattuck, as receiver of the New York Investment & Improvement Company, against the Guardian Trust Company of New York. From a judgment for plaintiff granting partial relief, he appeals. Affirmed.

See, also, 126 App. Div. 915, 110 N. Y. Supp. 1145; 130 App. Div. 898, 115 N. Y. Supp. 1144.

Argued before INGRAHAM, P. J., and McLAUGHLIN, CLARKE, SCOTT, and DOWLING, JJ.

Charles E. Hotchkiss (Herbert Barry, of counsel; Julien T. Davies, on the brief), for appellant.

Henry D. Hotchkiss, for respondent.

CLARKE, J. The complaint alleges that on or about December 16, 1905, the New York Investment & Improvement Company deposited with the defendant $75,000, which the defendant received and agreed to hold for the use of the New York Investment & Improvement Company and to pay the same on demand or upon its order, with interest at the rate of 2½ per cent. per annum; that the plaintiff has been appointed receiver of the New York Investment & Improvement Company in an action; that he demanded from the defendant said sum with interest; but that it has neglected and refused to pay said sum, or any part thereof, except $69.04. The answer

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

avers that the defendant had paid $70,000 on the check of plaintiff's company on December 29, 1905, and $5,000 on January 2, 1906.

It appears that on December 11, 1905, a resolution was duly passed by the directors of the New York Investment & Improvement Company directing the president and treasurer to deposit with the Guardian Trust Company, and providing:

"That all checks, drafts or other orders for the payment of money shall be signed by the president and countersigned by the treasurer of the company, unless the board of directors shall, by resolution, authorize other or additional officers to sign or countersign the same."

On December 16, 1905, the company, by its president, Charles L. Spier, duly deposited $75,000 with the defendant. At the time of the deposit, there was delivered to the defendant a certified copy of the resolution passed by the directors and a card containing the authorized signatures of the president and treasurer.

The court found: That on or about December 29, 1905, said Spier drew on said account a check for $70,000 in form as prescribed by said resolution, but in fact genuine as to his signature and forged as to that of Lauterbach, treasurer of the company, and then known by said Spier to be so forged, with a similar finding as to a check for $5,000; the date of payment being stated as prior to May 6, 1906. That upon the faith of said checks in due course of business, without knowledge of the forgery of the signature of the treasurer and without notice to put it upon inquiry, defendant paid said Spier said checks. That on May 5, 1906, said Spier requested defendant to balance said passbook, which it did, showing the debit of said $75,000, together with $69.04 interest to December 30th, less the two checks for $75,000, leaving a balance of $69.04 as of May 5, 1906 and defendant then and there delivered to said Spier the passbook, together with the said two vouchers, and he gave a receipt for the same as follows:

"Received passbook balanced to May 5, 1906, and two vouchers as per list. New York Investment & Improvement Company, by Charles L. Spier, President. Dated May 5, 1906."

That said passbook so balanced came into the possession of the treasurer of the company, said Lauterbach, on or about May 7, 1906, but without the two said vouchers. That the evidence discloses no trace of said two vouchers subsequent to their delivery to said Spier on May 5, 1906. That on May 17, 1907, said plaintiff demanded of defendant payment of said deposit with interest thereon. That the defendant was not notified of the forgery by the depositor or its receiver within one year after its return of the vouchers. And, as a conclusion of law, that on May 5, 1906, the account between the defendant and the said company was stated and the balance struck, whereby it became indebted to said company in the sum of $69.04. That plaintiff can only open said account for fraud or mistake, which it has not done. That, "according to the allegations and proofs," the two forged checks were returned to the depositor on May 5, 1906, and the depositor failed to notify the defendant of the forgeries within

one year thereafter, and directed judgment for $69.04, the admitted interest due.

The appellant claims that section 326 of the Negotiable Instruments Law (Consol. Laws 1909, c. 38) is in effect a statute of limitations and to be available must be pleaded. Not having been specifically pleaded, it is not available here. To which the answer is made that the facts are pleaded which make the statute apply, and that there was no necessity of pleading it specifically; that it is not a statute of limitations, but a condition.

The complaint states a full and complete common-law cause of action, the deposit of a sum of money with a trust company, organized under the banking law of the state of New York, under an agreement to pay said amount on demand to or upon the order of the depositor with interest at the stipulated rate; that plaintiff demanded the said sum with accrued interest, which defendant refused to pay except for the sum of $69.04.

Defendant upon the trial, and now, relies for its defense upon section 326 of the Negotiable Instruments Law:

"No bank shall be liable to a depositor for the payment by it of a forged or raised check, unless within one year after the return to the depositor of the voucher of such payment, such depositor shall notify the bank that the check so paid was forged or raised."

In my opinion no such defense was alleged in the answer.

The third separate defense alleges: That the check of $70,000 drawn on this defendant on December 29, 1905, bore what purported to be the signatures of Charles L. Spier and Alfred Lauterbach. That, "long subsequent" to the occurrences hereinbefore alleged, claim was made upon defendant by or in plaintiff's behalf that the signature of said Alfred Lauterbach was forged by the said Spier. That the latter took and converted to his own use the proceeds of said check, and that because of such forgery and conversion defendant was still indebted to said New York Investment & Improvement Company, or to this plaintiff. That on information and belief it denies that the facts are as set forth in said claim, but that Spier on behalf of said company agreed on its behalf to loan $70,000 to a business firm. That he indorsed and paid over said check to said firm in pursuance of said agreement of loan. That said firm executed and delivered three promissory notes or other agreement to repay said sum, and that on January 29, 1906, said firm paid these said notes or obligation to said company.

It will be noted it is not alleged how "long subsequent" this claim was made. The defense that Spier loaned the said sum to a business firm, which gave a note therefor to the said company, which on January 29, 1906, paid said note, certainly does not suggest that defendant intended to rely on section 326.

The fourth separate defense alleges: That the check for $70,000 drawn on December 29, 1904, bore what purported to be, and what with due care defendant believed to be, the signature of Spier and Lauterbach. That, on receipt of said balanced passbook and vouchers, the New York Investment & Improvement Company made no ex-

amination of said account or vouchers, or any effort whatsoever to discover the validity of said vouchers; nor did it make any such examination or effort within a reasonable time thereafter, but wholly failed so to do and failed to notify defendant that the name of its said treasurer to said check for $70,000 was a forgery, until on or about May 17, 1907, when this plaintiff claimed payment as in the complaint set forth. That, if said company had examined its said passbook and vouchers within a reasonable time, by the exercise of the slightest care the said alleged forgery would have been discovered. That, had such forgery been made known to defendant within a reasonable time after the discovery thereof, defendant would have been able to recoup itself for the full amount thereof from moneys then in the hands of the said Spier, or to which he was entitled. In short, what is set up is a plea of estoppel in pais, due to the negligence of the company in not examining the vouchers with due diligence, and consequent detriment to the defendant, in that it was thereby prevented from recouping itself.

The proof wholly failed to establish this defense. I do not think it possible to transform this defense clearly pleaded in estoppel, based upon the doctrine of Critten v. Chemical National Bank, 171 N. Y. 219, 63 N. E. 969, 57 L. R. A. 529, into a defense based upon the statute now relied upon. These are the only parts of the answer which give any color to the claim that the statute has been pleaded, or that facts are sufficiently averred to bring the case thereunder.

[1] We must decide, then, whether section 326 of the Negotiable Instruments Law is a statute which must be pleaded in defense in order to be availed of, like the statute of limitations, the statute of frauds, and other like statutes, or is a condition precedent, which must be pleaded by the plaintiff and avoided by him.

The respondent claims that it is a condition, and likens it to the provisions of law requiring notice to be served within a given time after an accident as a condition precedent to the right of action given against a municipality to recover damages caused by its negligence. The appellant answers that, if it be interpreted to be such a statute, it is unconstitutional, for no such requirement can be attached as a condition precedent to a common-law action against private individuals.

In McMullen v. City of Middletown, 187 N. Y. 37, 79 N. E. 863, 11 L. R. A. (N. S.) 391, the court had under consideration the constitutionality of a statute requiring notice to a municipal corporation in a negligence case, and the claim was there raised that if it was a condition precedent it was unconstitutional. The court, basing its argument upon the fact that municipal corporations were creatures of statute, which were political or governmental agencies of the state and to which had been delegated a portion of the sovereign power for the public good, said:

"The power to grant or to deny a remedy by private action for the breach of a duty imposed upon it for governmental purposes, and to affix conditions where the right to an action is given, is not one which should be called in question"—and cited with approval Curry v. City of Buffalo, 135 N. Y. 366, 32 N. E. 80. "The whole matter of maintenance of this class of actions was within the control of the Legislature; it could refuse a right of action against

municipalities for such injuries, and it could impose any conditions precedent to the maintenance of such actions."

Again:

"In the case of these quasi municipal corporations, constituting political divisions of the state for convenience of government and which existed without special charters, the common law gave no right of action in such a case as this."

I think this statute is of the class covered by the rule summed up in Crane v. Powell, 139 N. Y. 379, 34 N. E. 911:

"The statute of frauds is a shield which a party may use or not for his protection just as he may use the statute of limitations, the statute against usury, that against betting and gaming, and others that might be mentioned. I take it to be a general rule of universal application that the statutes last mentioned are not available to a party unless specifically pleaded, and there is no reason for making the statute of frauds an exception to the rule. The present system of procedure is founded upon the idea that litigants should, when possible, know in advance the precise questions they must meet at the trial. When a contract is set out in the complaint as the cause of action, and the defendant intends to assail it on some special or statutory ground, the general spirit of the system is not complied with unless notice is given of this intention to the opposing party by the pleadings."

This point is emphasized by the fact that in the case at bar the defendant did not content itself with its general denial, but set up five separate defenses which it felt itself authorized to interpose. As this defense was not included, it is fair to conclude that it was not in the pleader's mind.

My personal view, therefore, is, that it was a fatal error to dispose of this case upon the ground that the statute cited was a complete bar, for no such defense was tendered by the answer, and so was not available upon the trial.

As my Brethren differ with me—and among themselves—upon the two propositions (that is, first, whether the statute must be pleaded as a defense; and, second, whether facts have been sufficiently alleged to make the statute available though not specifically pleaded), I deem it my duty, after thus stating my personal views, to waive them and decide the appeal upon grounds which command themselves to a majority of the court.

Two other questions have been argued at bar:

[2] First. Appellant claims that, assuming the statute can be availed of, there is no proof that the vouchers were ever returned to the company; that, its president having undertaken to defraud it, he was no longer its agent, and delivery to him was not delivery to it. We think this contention unsound. The trust company had received the deposit from the company at the hands of its president accompanied with a certified copy of the resolution of its board of directors authorizing said deposit to be drawn out on checks signed by the president and treasurer and had delivered to him its passbook. That president had left the passbook with the company to be balanced, and to him the passbook, when balanced, and the vouchers, had been returned. As a corporation must act by agents, with what agent could the trust company, ignorant of the facts, more safely deal than the president,

duly certified by the board of directors of the company? No bank could safely carry the account of any corporation if the rule claimed by appellant should be established.

Further, Spier delivered the passbook to the treasurer, Lauterbach, and he made inquiries of Mr. Haynes, the secretary of the Guardian Trust Company, of the way in which the money had been drawn, and was told that it had been drawn by Spier on two checks. Mr. Lauterbach knew of the resolution providing for his signature to checks. He testified:

"I never signed my name to any check, voucher, or draft or other instrument for the payment of money in connection with or relating to the account of the New York Investment & Improvement Company with the Guardian Trust Company."

Having the passbook in his possession showing the withdrawal of the money, and knowing that he had never signed any check, he did not at any time say to Mr. Haynes or at any time to any officer of the defendant that any check that had been paid by the defendant had been forged. The president had received the vouchers, the treasurer had received the passbook balanced, and knew that such balance was the result of a forgery. We cannot say that no delivery of the vouchers had been made to the corporation when they had been in fact delivered to the president, who was clothed with apparent authority to receive them, and the treasurer had been advised thereof by the president.

[3] Second. The learned court excluded evidence of a conversation between Lauterbach, the treasurer, and Barber, a member of the firm of Hotchkiss & Barber, the elected counsel of the defendant, and himself, a director and a member of the executive committee of the defendant, had a very short time after the 7th of May, when the passbook and vouchers were returned to the company. If that evidence was competent, appellant claims an issue of fact would have been presented as to whether the defendant had received notice within the year which would have prevented the court passing upon the case as matter of law. The question is: Was notice to Barber under the circumstances of this case such notice to the defendant as would take the case without the section of the negotiable instruments law cited?

Mr. Lauterbach testified that he had two interviews with Mr. Barber, of the firm of Hotchkiss & Barber, "who now appear here as the attorneys for the Guardian Trust Company," in the latter part of May or the early part of June, 1906. The evidence which was excluded was as follows:

"I called Mr. Barber up. I said to him that I would like to have an interview with him in regard to the Spier situation. He said in reply he would be very glad to see me in regard to it, and a definite appointment was made."

After they got together, he said:

"We first discussed, I think, the question of views as to what the cause of Mr. Spier's death was. Then discussed Mr. Spier's financial operations generally. We talked about the situation that existed with Keech, Loew & Co., and I then stated to Mr. Barber that I was placed in— I said substantially

—I do not know the identical words—that I was placed in a most awkward predicament in regard to the matter; that I had received a communication from Spier after his death which he had asked me to keep sacredly confidential, * * * which for Spier's sake I as his friend was anxious to keep silent in regard to it, but that under the circumstances I felt that it was my duty to inform him as counsel for the Guardian Trust Company of the nature of the document. * * * He said he would be glad to see it. I thereupon showed him what I have designated the document, which was a letter which I had found on my desk on my arrival, at my office on Monday, May 7th: * * *

" 'My dear A. L. I want to hand you herewith two policies amounting to $75,000 made out to your order as trustee. In case anything should happen to me will you dispose of the proceeds as follows:

| | |
|---|---:|
| Pay into the Guardian Trust Co. for a/c N. Y. I. and I. Co. | $68,067 09 |
| To Eugene B. Howell................................... | 2,500 00 |
| To my wife Dot W. Spier.............................. | 4,432 91 |
| | |
| Total ............................................... | $75,000 00 |

" 'In accordance with the resolution of the board of directors of Dec. 11/05 I have paid out as follows:

| | |
|---|---:|
| To settlement of judgment against N. Y. I. and I. Co., with costs and interest..................................... | $2,932 91 |
| To C. L. S. for services as per resolution................. | 4,000 00 |
| | |
| | $6,932 91 |

" 'There is due the Richmond L. and R. R. Co. for advances the sum of $1,048.75 and to Davies, Stone & Auerbach $7,185.61, with interest at 5 per cent. from March 22, 1897. A. O. Beebe claims $2,400 for services. He might be paid $2.000. With the above matters paid off, the balance should be divided among the stockholders, as there are no other debts outstanding. If you can consistently carry this matter out for me and keep the facts to yourself you would confer a lasting obligation upon me. Will you do so? Appreciating anything you will do, I am, Sincerely yours, Charles L. Spier. I turn over to you as treasurer the stock of the Ferry Co. vouchers and such books as I have.' * * *

"I said to Mr. Barber that I thought it would be well if he could get the details of the transaction in some way, to find out exactly how the money had been paid to Mr. Spier. The $75,000. * * * In the discussion of the letter I stated to Mr. Barber that Spier had left the two insurance policies in this same envelope aggregating $75,000; that he had insured his life for the purpose of making good his defalcations. I think I * * * remarked that he was faithful to his employer even though he had taken the $75,000 from the Investment & Improvement Company, but that he had tried to restore it, and had sacrificed his life to do so, by insuring it for $75,000, * * * getting an incontestable policy and in a company which did not contest on the grounds of suicide. * * * Q. What have you said, or what did you say at that interview to Mr. Barber, particularly in respect of this deposit of $75,000 with the Guardian Trust Company and the entries in the passbook? A. I stated that Mr. Spier must have forged my name to the check to have drawn it out. * * * I stated that he had embezzled; that he had evidently embezzled moneys; * * * and that he had stolen from the Investment & Improvement Company the $75,000 which had been deposited to the credit of the New York Investment and Improvement Company with the Guardian Trust Company. * * * My impression is that I stated to Mr. Barber at this interview that I did not think that Spier was the sort of man who was a forger, and that I was very much astonished when I found the passbook on my desk. * * * I stated to him that I had never signed a check for it, and that my name must have been forged in the voucher, and we hadn't any vouchers—that there were no vouchers with the passbook. I told him that I had learned. * * * at my conversation with Mr. Haynes, that Spier had visited the Guardian Trust Company on the Saturday prior to his death. That was May 5, 1906, * * * and had asked for the pass-

book of the New York Investment & Improvement Company, and that it had been returned to him with the two vouchers. * * * I suggested that it would be well to find out what the exact transaction was from the Guardian Trust Company and find out if it had been—to see what became of the check, and trace it through the various banks, if possible. And Mr. Barber said that he would make an effort to learn those facts, and that he would communicate with me again and try to find out."

The plaintiff attempted to show that the defendant had received actual notice. It called Mr. Haynes, the secretary of the Guardian Trust Company; but he testified: That while he had an interview with Mr. Lauterbach, the treasurer, within a very short time after the 5th of May, 1906, and a few days after Mr. Spier's suicide or death, that Mr. Lauterbach had only asked to see the signature cards and resolution of the New York Investment & Improvement Company. That "he did not say anything to me to the effect that any check that had been paid by our company was forged." That, so far as he personally knew, the demand made by the receiver on May 17, 1907, was the first notice received by the defendant of any objection to the account in this passbook. He further testified as to meetings of the board of directors and meetings of the executive committee at which Mr. Barber was present, four of which occurred in May, 1906:

"At none of these last four meetings that I have mentioned was any reference made to Mr. Spier, and no reference was made to the New York Investment & Improvement Company. I do not find in the minutes of the month of June that the name of Mr. Spier or the New York Investment & Improvement Company appears. I do not see either of those names in the minutes of the directors' meetings for the months of May and June. I had no intimation prior to May 17, 1907, that the authenticity of these signatures on these alleged checks was questioned."

Mr. Barber, called by the plaintiff, testified: That in 1904 the Guardian Trust Company made a loan to certain underwriters of the Yetman Typewriting Company, of which Spier was president and a subscriber to the underwriting syndicate which he had got together, to the extent of $15,000. Lauterbach was a subscriber to the extent of $5,000 and several of Mr. Spier's friends and associates; the aggregate indemnity being $80,000. That after the death of Mr. Spier there came to him within a few days the information from Mr. Yetman that Mr. Spier had left two insurance policies aggregating $75,-000 payable to Alfred Lauterbach, trustee. That at that time the Trust Company had pending suits on this underwriting against Mr. Spier and Mr. Lauterbach and several of the other underwriters. That he had called up Mr. Lauterbach's office in the latter part of the week following Mr. Spier's death, but that Lauterbach was out. That the next Monday he went to Mr. Lauterbach's office, pursuant to an appointment made upon his (Barber's) request. That he initiated the interview with Mr. Lauterbach himself. That he went to him as the representative of the Guardian Trust Company and interviewed him in regard to the existence of some life insurance policies. That Lauterbach collected the insurance money on Saturday, and that Barber was at his office the following Monday, May 14th. Mr. Lauterbach told him that the money had been paid to him the Saturday before; that Lauterbach had showed him a letter addressed to him from

Spier; that is, the letter that created the trust; that he learned that there was no trust fund created for this underwriting indebtedness. "In my communications with other officers and directors of the Guardian Trust Company in reference to the underwriting claim, I did not make any reference to this trust fund."

That is, the appellant undertook the burden of showing that the information which it claims that Lauterbach gave to Barber that the checks were forged was actually communicated to the company. This it failed to do and must rely, therefore, upon the proposition that notice to Barber was notice to the company.

Reading all of this evidence together, I think that the conversation stated by Lauterbach to have been had with Barber did not constitute notice to the defendant, and hence was properly rejected.

[4] Barber, it is true, was a director and a member of the executive committee; but, while notice to the board of directors is notice to the corporation, notice to one director, not communicated to the board, is not.

[5] Where notice is required to be given to a bank, it seems to me that a real notice is intended, addressed to its officers. While it is not prescribed in the statute how the notice is to be given, it is required that the depositor "shall notify the bank." Barber denies that any such conversation took place, and testified that his interview was upon an entirely different matter, to wit, a pending suit against the Yetman Typewriting Syndicate, and that while he did see the letter from Spier to Lauterbach, which established that Spier was an embezzler, he was not in any way at the time representing the company in relation to the New York Investment & Improvement Company account, and that he never communicated the information received to any officer of the company.

It seems to me that we must hold, in the absence of proof that Barber was engaged as an agent of the company in that particular matter, or had communicated his knowledge to the officers or the board of directors, or that Lauterbach had given him the information with the purpose of notifying the company that the checks were forged, and with the intention that Barber should communicate said notice to the officers or board of directors, that Barber's personal knowledge was not attributable to the company.

[6] "The directors of a corporation are not individually its agents for the transaction of its ordinary business which is usually delegated to its executive officers, such as its president, secretary, treasurer, and the like. * * * Notice to them when assembled as a board would undoubtedly be notice to the corporation. Such notice to an individual director which is in fact communicated to the board by him is notice to the corporation, for this thus becomes notice to the board. But it is well settled, as a general rule, that mere private knowledge of one or more individual directors concerning any business of the corporation (as to which such director has then no special duty or authority to act, or upon which he does not subsequently act with such knowledge in his mind and which he does not communicate to the board) is not to be imputed to the corporation." Mechem on Agency, pp. 150, 151.

See, also, Casco National Bank v. Clark, 139 N. Y. 307, 34 N. E. 908, 36 Am. St. Rep. 705, and Merchants' National Bank v. Clark, 139 N. Y. 314, 34 N. E. 910, 36 Am. St. Rep. 710.

As a majority of the court agree that the bank did not receive notice of the forgery within one year after the payment and the return of the vouchers, the judgment appealed from should be affirmed, with costs and disbursements to the respondent.

The order permitting the answer to be amended should also be affirmed.

McLAUGHLIN, J. I concur in the opinion of Mr. Justice CLARKE, except in so far as he holds (1) that a defense under section 326 of the Negotiable Instruments Law is not pleaded; and (2) in the construction which he puts upon such section.

[7] This section provides that:

"No bank shall be liable to a depositor for the payment by it of a forged or raised check unless within one year after the return to the depositor of the voucher of each payment, such depositor shall notify the bank that the check so paid was forged or raised."

(1) In the second defense it is alleged that on December 29, 1905, the New York Investment & Improvement Company drew its check on the defendant for $70,000, and on January 2, 1906, drew another check for $5,000; that on May 5, 1906, the passbook of the Investment & Improvement Company was balanced and delivered, together with the two checks; and that no objection to said account was made until on or about the 17th of May, 1907. The third defense incorporates in substance the foregoing facts, and alleges, in addition, that, long subsequent to the delivery of the passbook and checks by the plaintiff, one of the signatures on the checks was a forgery. The fourth defense incorporates all of the allegations of fact contained in the second defense and, in addition, alleges that the checks in question bore signatures which purported to be those of Spier and Lauterbach, who were, respectively, the president and treasurer of the Investment & Improvement Company, and were authorized to sign the same; that on receipt of the passbook and vouchers the depositor made no examination of the account and failed to notify the defendant that the name of its treasurer to said checks was a forgery, until on or about May 17, 1907.

The Code of Civil Procedure prescribes what an answer shall contain (section 500)—a general or specific denial of each material allegation of the complaint or of any knowledge or information sufficient to form a belief, and a statement of any new matter constituting a defense or counterclaim in ordinary and concise language, without repetition.

Here, as it seems to me, the answer states all the facts necessary to bring the case within the section of the negotiable instruments law referred to. What other facts should be set forth? It is unnecessary in a pleading to recite or even refer to a public statute of our own state, because the court takes judicial notice of its existence. O'Brien v. Kursheedt, 79 Hun. 615, 29 N. Y. Supp. 973; Schradin v. N. Y. C. & H. R. R. Co., 124 App. Div. 712, 109 N. Y. Supp. 428, affirmed 194 N. Y. 534, 87 N. E. 1126; McHarg v. Eastman, 35 How. Prac. 205; Smith v. Merwin, 15 Wend. 184. All that

is required to bring a case within the statute is to set out the neces-sary·facts, and, if this be done, then the statute will be applied. The facts necessary to bring this defense within the terms of the statute are, I think, alleged.

(2) To entitle the plaintiff to recover—payment of the checks having been made upon a forged signature—he had to allege and prove that within one year after the vouchers were returned the required notice was given. This is a condition precedent; it is an essential element of plaintiff's cause of action. The statute, I do not think, is analo-gous to the statute of limitations, the statute of frauds, or other stat-utes which a defendant must set up as a defense or be deemed to have waived it. To my mind it is much more closely analogous to the provisions in the standard policy of insurance prescribed by statute, that no action can be maintained upon such policy unless proofs of loss are served within a specified time, which it is settled is a condi-tion precedent to be alleged and proved by the plaintiff. Such I think is the clause quoted from the statute. It is an essential element of plaintiff's right to recover upon a forged or raised check that notice in due time shall have been given the depository. The defendant al-leged affirmatively that the notice was not given. It doubtless was unnecessary for the defendant to do this. It, however, was proper to call the plaintiff's attention to the fact that it had failed to give the required notice, and, having done so, in advance of the trial, it does not now lie with the plaintiff to say that the defendant is not in a position to take advantage of the fact that the plaintiff has failed to allege or prove a proper notice.

I think the judgment is right and should be affirmed, with costs.

DOWLING, J., concurs.

SCOTT, J. I concur in the opinion of my Brother CLARKE that section 326 of the Negotiable Instruments Law provides a defense, which, to be availed of, must be pleaded and proven, and that it is not a condition precedent to be pleaded as part of the cause of action when a depositor sues his bank for the amount on deposit, which has been apparently depleted by the payment of forged or raised checks. I also agree with my Brother McLAUGHLIN that the de-fendant has sufficiently pleaded this defense, by setting forth all the facts necessary to sustain it, although it does not refer to the statute in terms. I think, however, that so much of the deposition of Mr. Lauterbach as was excluded should have been admitted in evidence, and that, if credited, it would have been sufficient to show that defend-ant had been notified in due time that the checks drawn by Spier were forged, so far as concerns the signature of Lauterbach, the treas-urer. He swore distinctly that he told Mr. Barber that, if any checks had been paid bearing his signature, they had been forged. The de-fendant knew that but two checks had been drawn, that they prac-tically exhausted the deposit, and that they both purported to bear Lauterbach's signature. When Lauterbach stated to Barber that if any checks purported to bear his signature they were forgeries, there could have been no question as to which checks the notification re-

lated. If the same thing had been said to the president or other officer of the defendant in its banking office, I suppose there would have been no question that the notification was sufficient to satisfy the statute. If it was insufficient in this case, it could only be because it was made to Barber, who was a director of defendant and one of its counsel.

I recognize the rule, quoted by Mr. Justice CLARKE, from Mechem on Agency, that notice to a director concerning the business of the corporation as to which such director has then no special duty or authority to act, or upon which he does not subsequently act with such knowledge in his mind, and which he does not communicate to the board, is not to be imputed to the corporation. Substantially the same rule, as I understand it, applies to notice given to or knowledge acquired by an attorney relating to a matter which he has not then in hand as such attorney. But I do not think that the rule applies to the present case. Mr. Barber was at once a director and one of the regular attorneys for the defendant. The occasion of his interview with Mr. Lauterbach was to discuss the situation which has been created by the defalcation and sudden death of Spier. It is true that other matters were discussed besides the withdrawals of plaintiff's funds from defendant; but that subject and the manner in which it had been effected were also discussed, and it must have been obvious to both Mr. Barber and Mr. Lauterbach that the question as to the liability of defendant for having paid out the money was one which would probably become a matter of dispute. The statute does not prescribe the manner or form in which notice must be given, and I think that any notice which fairly apprises the depository bank that a claim will be asserted that it has paid out money on a forged or raised check is sufficient. I am also of opinion that the excluded portion of Mr. Lauterbach's deposition would have justified a court or jury in finding that such notice was given. If so, its exclusion was erroneous.

I am therefore for reversal and a new trial.

INGRAHAM, P. J., concurs.