AMERICAN BUILDING MAINTE-
NANCE COMPANY OF CALIFOR-
NIA INCORPORATED, Plaintiff,

v.

FEDERATION BANK & TRUST COM-
PANY, Defendant.

United States District Court
S. D. New York.

Jan. 11, 1963.

on checks drawn by plaintiff but bearing forged indorsements.

## ESTOPPEL

The duty of a bank to refrain from honoring a depositor's checks presented with forged indorsements is contractual. The depositor may, however, estop himself from enforcing this contractual duty by conduct which induces its breach. Such conduct is sometimes referred to as negligence and, if the bank is negligent in acting upon the conduct of the depositor, the bank's negligence deprives it of the defense that the depositor induced the improper payment. Stella Flour & Feed Corp. v. National City Bank, 1st Dept., 285 App. Div. 182, 136 N.Y.S.2d 139.

Defendant here contends that the depositor's conduct was such as to estop the depositor from insisting that amounts deducted from its account in payment of checks with forged indorsements should be restored. It is said that the depositor had actual notice that indorsements on its checks were being forged, or had reason to believe that indorsements were being forged so compelling as to amount to actual notice, and that, in failing to pass this information on to the bank, it caused the bank to continue paying on forged indorsements. Fidelity & Deposit Co. v. Queens Co. Trust Co., 226 N.Y. 225, 123 N.E. 370, is cited for the proposition that actual knowledge is not required for actual notice.

On this branch of the case it must be borne in mind that the burden is upon the bank to establish its affirmative defense of estoppel, Paton Co., Inc. v. Guaranty Trust Co., 1st Dept., 227 App.Div. 545, 549, 238 N.Y.S. 362, and that the depositor is under no duty to examine the returned checks to detect forgery in the indorsements. National Surety Co. v. President, etc., of Manhattan Co., 252 N.Y. 247, 254, 169 N.E. 372, 67 A.L.R. 1113. The burden is upon the bank to show that the depositor, for a period before it advised the bank that checks were being paid on forged in-

Rogers, Hoge & Hills, New York City, for plaintiff; Alfred P. O'Hara, Kenneth L. Everett, New York City, of counsel.

Maurice, McNamee & White, New York City, for defendant; Stewart Maurice, Thomas E. White, William P. Sullivan, Jr., New York City, of counsel.

DIMOCK, District Judge.

This is an action by American Building Maintenance Company of California Incorporated, a depositor in defendant Federation Bank & Trust Company, to recover amounts paid out by the bank

dorsements, had actual notice that that was the case.

The facts are not in dispute. Three employees of the depositor, Brettholz, who was New York branch manager, Moscowitz and Fogelman, pursuant to a conspiracy, padded payrolls by crediting fictitious or actual employees with amounts to which they were not entitled. As a result of the padding of the payroll, checks were automatically issued under the office routine made out to the named employees. One of the three conspirators, almost always Moscowitz, would then take these checks, forge the employees' names thereon and get them cashed in batches at defendant bank's 45th Street branch. In the vast majority of occasions, defendant bank did not even require a second indorsement by the conspirator who was presenting the checks for payment. The thievery began in 1954. It continued until the conspirators had stolen more than $200,000, the proceeds of more than 3,000 checks.

In August 1958, the operating manager of the company in San Francisco sent one Mr. Franklin to New York as a subordinate to Brettholz but with the title of office manager. He was sent as a trouble shooter to find out why the company was sending a lot more capital into this operation than "what P & L statements showed we were losing". He was directed to find out about the situation from the office end of it and not in operations; "for instance" as he said, "to delve into our accounts with our suppliers, to audit our invoices that we had paid, as against the books." That took him several months off and on. He testified that, in March 1959, he had occasion to go through the cancelled checks to start a bank reconciliation. He noticed certain handwriting on some of the checks that appeared vaguely similiar to handwriting on others. He compared the signatures with those on the W–4 forms required to be completed for withholding tax and social security purposes and, in making this comparison, found nothing wrong. This was not unnatural since the same hand that forged the indorsements on the checks had forged the ostensible signatures of the fictitious employees on the W–4 forms.

In the latter part of June 1959, Franklin reported to Mr. Schutt, the depositor's regional manager, that the indorsements on certain checks were suspicious. He gave to Schutt the names of three persons presumably employed in one of the buildings serviced by the depositor. Schutt inquired of the foreman of the building if the three persons worked there and, upon being informed that they did not, he reported the matter to the depositor's vice president, Mr. Strauss, whose office was located in San Francisco. A large number of the depositor's records, including cancelled checks, were then shipped out of New York to plaintiff's offices where an attorney was retained to investigate the matter. Near the end of July 1959, Detroit counsel engaged private investigators in New York who, under the guise of a security check, ascertained that persons carried on plaintiff's payroll as working in certain buildings served by plaintiff were not in fact working. The investigator checked the addresses of a number of the persons appearing on plaintiff's records and found that some of them were non-existent or that the names were unknown at the addresses given.

On August 17, 1959, it was determined that enough evidence had been obtained to warrant the charge of forgery and to identify those responsible. At that time the evidence was submitted to the bank and its cooperation in apprehending the guilty parties was secured. When the conspirator Moscowitz presented checks for cashing on August 21, 1959, marked money was delivered and he was apprehended by a detective as he left the bank.

Defendant points to two additional circumstances as being persuasive that the depositor had such compelling reason to suspect the forging of indorsements as to amount to actual notice. Many of the copies of W–2 income tax report forms which were sent to names and addresses on the payrolls were re-

turned undelivered. In addition, the conspirators, in order to add versimilitude to their fictitious entries, were forced to make deposits in plaintiff's account ostensibly resulting from compensation for work done on a particular building which had not been done and these deposits were made at the main office rather than at the 45th Street branch where plaintiff had its account.

The return of tax forms was not unusual since plaintiff's employees were mostly itinerants and, therefore, it did not excite suspicion. Indeed, of 150 such returns in 1958, only 30 were returns of forms addressed to fictitious persons. The deposits made would not excite suspicion since they were ostensibly for work at a location where work had been done before.

There is no substance to any argument that the transparency of the whole scheme was from the start not only so clear as to generate suspicion but even to give actual notice of which plaintiff was under a duty to inform the bank. The repeated success of this padded payroll method of theft is proof enough that it is not transparent.

The claim that, immediately after Franklin noticed what he thought was similarity in the indorsement of the checks or at some time thereafter before August 17 when the bank was advised, the depositor had received so much information as to amount to actual notice that indorsements were being forged, has a little more substance than that the scheme was transparent at the beginning. The question, however, is not whether the depositor had actual notice that it was losing money or that checks were being presented in batches with indorsements so suspiciously similar as to prompt comparison with W–4 forms or that three employees supposed to be working at a certain building were not working there. The question is whether the bank has sustained its burden of showing that at some time before August 17 the depositor had actual notice that indorsements were being forged.

We must bear in mind that such investigation as was being made was being made solely for the benefit of the depositor. It was under no duty to the bank to examine the vouchers to detect forgery in the indorsements. Only upon discovery or what amounted to discovery, whenever and however it should take place, would the duty arise to notify the bank so that the bank might avoid the liability involved in paying out on similarly forged indorsements. National Surety Co. v. President, etc., of Manhattan Co., 252 N.Y. 247, 254, 169 N.E. 372, supra.

The bank suggests that surely, when, on top of the peculiarities of the indorsements on the returned checks, the defendant was informed that three persons presumably employed in one of the buildings serviced by the depositor did not work there, there was the requisite actual notice that the indorsements were forged. That information was not received until the latter part of June 1959 and we know no more than that three unnamed employees were not where they were supposed to be. The depositor had as many as 500 employees servicing many buildings. It might well have concluded that the three employees were assigned to the wrong buildings on the books. Instead of reaching some such conclusion the depositor, upon discovery that three employees were missing, instituted a thorough-going investigation beginning with a shipment of the records to a home office and followed by the engagement of private investigators near the end of July whose report was felt by the depositor to justify going to the bank and charging the employees with forgery of the indorsements on August 17.

The bank has not sustained its burden of proof that the depositor had what amounted to actual notice that the indorsements were forged at the time of the discovery that three employees were missing from their ostensible posts. The bank presented no evidence in addition to that detailed above as to the information obtained by the depositor between that time and the time that it was im-

parted to the bank. The evidence in the record does not show that, at any time prior to the conference with the bank on August 17, 1959, the depositor had what amounted to actual notice that indorsements were being forged.

■ Moreover, the bank has the burden of proving not only conduct which would estop the depositor from making its claim but also proof that the bank itself did not contribute to the conduct which would otherwise estop the depositor. Paton Co., Inc. v. Guaranty Trust Co., 1st Dept., 227 App.Div. 545, 549, 238 N.Y.S. 362, supra. Thus it was incumbent upon the bank to prove that its failure to demand of Moscowitz the customary second indorsements did not contribute to the postponement of the depositor's notice to the bank that indorsements were being forged. It is reasonable to suppose that, if the checks with their peculiar indorsements which turned up in batches all bore the second indorsement of Moscowitz, the reaching of the conclusion that the prior indorsements were forged would have been accelerated. The bank has not sustained its burden of showing that it did not contribute to any conduct which would otherwise have estopped the depositor.

The claim of estoppel has not been made out.

## SECTION 43 of the
## NEGOTIABLE INSTRUMENTS LAW

■ Section 43 of the New York Negotiable Instruments Law provided at the time of the transactions here involved that no bank should be liable to a depositor for the payment by it of a check bearing a forged or unauthorized indorsement unless, within two years after the return to the depositor of the voucher, the depositor should notify the bank "that the check so paid bore such forged or unauthorized endorsement."

Plaintiff claims that it gave the bank notice within the terms of section 43 about August 17, 1959, when Strauss visited the president of the defendant bank and told him that a number of checks which had been examined by investigators and handwriting experts were believed to bear forged indorsements. The next day Strauss presented a number of the suspect checks to a Mr. De Santis, who had been put in charge of the matter by the president of the bank. On August 21 the conspirator Moscowitz was arrested at defendant bank after cashing a batch of checks.

On November 18, 1959, plaintiff's counsel wrote defendant bank advising it that the total amount paid by defendant on checks bearing forged indorsements was $212,906.08.

On January 19, 1960, plaintiff provided defendant with a list which gave the details of each check bearing forged indorsements.

Defendant claims that no sufficient notice under section 43 N.I.L. was given until January 19, 1960 and that all payments shown on statements rendered prior to January 19, 1958 are immune from recovery.

The only case which touches the subject is Shattuck v. Guardian Trust Company, 204 N.Y. 200, 97 N.E. 517. That case involves section 326 N.I.L., which deals with a forged or raised check but is otherwise couched in the same language as section 43. The Court of Appeals, reversing the Appellate Division, 204 N.Y. 200, 97 N.E. 517, held that evidence should have been admitted by the trial court which, p. 205, 97 N.E. p. 518, "would have tended to prove that the bank had notice of the plaintiff's claim that the money deposited with the bank had been paid by it upon checks that were forged as to the signature of the treasurer of the investment company, and that this notice was given within the year provided by the statute". The Court of Appeals based its decision upon the fact that the excluded evidence, if it were taken as true, tended to show, p. 207, 97 N.E. p. 519, "(1) [t]hat Barber was the representative of the bank; and (2) that he had direct knowledge of facts which it was his duty to communicate to the bank, and which it must be presumed he did so communicate." There was no discussion in the opinion

of the Court of Appeals as to whether or not the excluded evidence would have constituted notice within the terms of the statute.

The majority of the Justices in the Appellate Division, 145 App.Div. 734, 130 N.Y.S. 658, since they held that notice to Barber was not notice to the bank, were not concerned with the sufficiency of the notice itself. Mr. Justice Scott, however, who dissented on the question of Barber's authority, was faced with the question whether the notice was sufficient and went on to say, page 750, 130 N.Y.S., page 669:

"I think, however, that so much of the deposition of Mr. Lauterbach as was excluded should have been admitted in evidence, and that, if credited, it would have been sufficient to show that defendant had been notified in due time that the checks drawn by Spier were forged, so far as concerns the signature of Lauterbach, the treasurer. He swore distinctly that he told Mr. Barber that, if any checks had been paid bearing his signature, they had been forged. The defendant knew that but two checks had been drawn, that they practically exhausted the deposit, and that they both purported to bear Lauterbach's signature. When Lauterbach stated to Barber that if any checks purported to bear his signature they were forgeries, there could have been no question as to which checks the notification related. If the same thing had been said to the president or other officer of the defendant in its banking office, I suppose there would have been no question that the notification was sufficient to satisfy the statute."

All that plaintiff can say to bring the pre-specification notices here within the decision in the Shattuck case is: "The excluded parts of Lauterbach's deposition were included in the Record of Appeal before the Court of Appeals. In his deposition Lauterbach testified that when he talked with the bank officer, he did not know how much of the money on deposit with the bank had been paid out on forged checks nor was he able to specify in detail the check or checks involved. From Lauterbach's testimony it is clear that he was uncertain as to whether the bank had paid one or more forged checks (fols. 245–254, Record on Appeal)." An examination of those folios of the Record on Appeal reveals no statement by Lauterbach that he did not know how much of the money on deposit with the bank had been paid out on forged checks. The whole tenor of the conversation was that one Spier had drawn out the entire $75,000 on a check or checks on which he had forged Lauterbach's name. That Lauterbach did not know the number of checks that he had used is immaterial. There was only $75,000 and interest in the account and Spier had drawn out $75,000. The bank by reference to its own records could determine what the checks were both as to amount and date of withdrawal. The Shattuck case in the Court of Appeals is not authority for the sufficiency of any of the three notices here given except the last which detailed the amounts, dates and parties with respect to each check.

It is only when such information is given that a bank is in a position to make an investigation with respect to the validity of a claim that the check has been paid out on a forged indorsement. The statute means what it says when it conditions liability on notification by the depositor to the bank that "the check" paid bore a forged indorsement.

There can be no recovery from the bank with respect to any payments shown on statements rendered prior to January 19, 1958.

SECTION 326 of the
NEGOTIABLE INSTRUMENTS LAW

Section 326 of the Negotiable Instruments Law provides in language very similar to that of section 43 that no bank shall be liable to a depositor for the payment by it of a forged or raised check unless within one year after the

return to the depositor of the voucher of such payment such depositor shall notify the bank that the check so paid was forged or raised. It will be recalled that the period of limitation in section 43 is two years. As a matter of fact, the only other differences between the two sections are that section 43 describes the institution protected as a "national bank or banking organization as defined in the banking law", while section 326 defines it merely as a "bank", and section 43 deals with "a forged or unauthorized endorsement" while section 326 deals with a "forged or raised check."

In spite of the obvious intention of the legislature to distinguish between forged checks and checks bearing forged or unauthorized indorsements, the bank argues that the one year limitation should apply to the checks in suit.

Whatever may be the usual legal or dictionary definition of the word "forged" it is obvious that the Negotiable Instruments Law, in fixing the time within which the bank must be notified of the defect, distinguishes between checks bearing forged indorsements and checks which are themselves forged. The two year limitation applies in this case.

SECTION 28 of the
NEGOTIABLE INSTRUMENTS LAW

 Defendant contends that the checks here involved were, in contemplation of law, payable to bearer so that it was without significance that they bore indorsements which were forged.

During the time the checks in the suit were paid, section 28 N.I.L. provided in part as follows:

"The instrument is payable to bearer;

\* \* \* \* \* \*

"3. When it is payable to the order of a fictitious or non-existing person, and such fact was known to the person making it so payable."

Even before this enactment it had been held that where an existing payee was not intended to have any interest in the instrument he was to be treated as a fictitious or non-existing person and the instrument as one payable to bearer. Phillips v. Mercantile Nat. Bank, 140 N.Y. 556, 35 N.E. 982, 23 L.R.A. 584.

Two signatures were required and were used in the case of each check here involved. The question that arises as to each is whether the fact that the payee was not entitled to the check was known to "the person making it so payable".

This fact was known to Brettholz but not to the other signatory. Two New York cases, Commercial Factors Corp. v. Commercial Nat. Bank & Trust Co., p. 1803, col. 2, N.Y. Law Journal March 16, 1933, and United States Fidelity & Guaranty Co. v. National City Bank of New York, affirmed without opinion, 259 App.Div. 707, 19 N.Y.S.2d 144, and 284 N.Y. 651, 30 N.E.2d 496, have held that, where one of two necessary signatories knows that the payee is not entitled to the check but the other is ignorant of that fact, the instrument is not payable to bearer.

The first of these cases, Commercial Factors Corp'n v. Commercial Nat. Bank & Trust Co., relied upon the case of Paton Co., Inc. v. Guaranty Trust Co., 227 App.Div. 545, 238 N.Y.S. 362, affirmed without opinion 254 N.Y. 621, 173 N.E. 893. The second of the two cases, which was affirmed by the Appellate Division of the Court of Appeals, relied upon the first of the two, the Commercial Factors case. While in the Paton case the point was not adverted to in the opinion of the Appellate Division, it was brought to the attention of both appellate courts and necessarily involved in their decisions.

Defendant cites Hackensack Trust Company v. Hudson Trust Company, 119 Misc. 689, 197 N.Y.S. 158, aff'd without opinion, 207 App.Div. 897, 202 N.Y.S. 928, as standing for a New York rule that where one of two co-signatories knows that the payee is not intended to have any interest the instrument is deemed to be payable to bearer. If the

case so holds, it must be deemed to have been overruled when the Appellate Division later decided the Paton case and when it affirmed United States Fidelity & Guaranty Co. v. National City Bank of New York which relied upon the Commercial Factors case which relied upon the Paton case. Moreover the Hackensack Trust Company case is distinguishable in that the custom of two co-signors was initiated at the request of the bank and was not required by the depositor's by-laws so that the instrument was valid with the sole signature of the person who knew that the payee was not intended to have any interest in it. National Surety Corporation v. Federal Reserve Bank of New York, 161 Misc. 304, 292 N.Y.S. 607, affirmed without opinion 250 App.Div. 754, 296 N.Y.S. 240, cited by defendant, must also be deemed to have been overruled when the Appellate Division decided the United States Fidelity & Guarty Co. case.

The checks in suit are not entitled to treatment as if payable to bearer so as to render insignificant the fact that the indorsements were forged.

### ACCOUNT STATED.

On a pre-trial motion in this case, Judge Murphy decided, citing Potts & Co. v. Lafayette Nat. Bank, 269 N.Y. 181, 199 N.E. 50, 103 A.L.R. 1142, that there was no account stated resulting from the bank statements unless then the depositor had knowledge of, or reason to know of, the forged indorsements.

Plaintiff here had no reason to know that there was anything wrong with the bank statements. It was unlike the Potts case where the accounts submitted by the bank did not show deposits which the depositor had made. Here every transaction between the depositor and the bank was correctly reflected in the statements. The only incorrect part involved the acceptance by the bank of a forged signature of a third party.

### INTEREST

Plaintiff seeks interest on the amount of each check bearing a forged indorsement from the date of payment of the check. Defendant says that interest is payable only from the date of the specific demand of January 19, 1960. Plaintiff relies on section 480 of the New York Civil Practice Act which, as construed in Hart v. United Artists Corporation, 1st Dept., 252 App. Div. 133, 298 N.Y.S. 1, requires that there be added to an award of damages arising out of the breach of a contract interest from the date of the breach. Defendant counters by citing the principle that there is no breach of a contract between a bank and a depositor until the bank has refused a demand. That is undoubtedly the general rule but it is subject to the gloss that a repudiation by a bank renders a demand unnecessary. Oddie v. The Nat. City Bank of New York, 45 N.Y. 735; Tillman v. Guaranty Trust Co., 253 N.Y. 295, 297, 171 N.E. 61.

Thus, if the rendition of the bank's statements to the depositor showing the charging against the depositor's account of the checks bearing forged indorsements constituted a refusal to pay to the depositor the amounts charged against its account, there would have been a breach of the bank's contract at the time of the rendition of the statement and interest would be payable from that date on so much of the amount shown by the statement to have been charged against the account as represented payments on checks bearing forged indorsements.

The difficulty is that under the New York law the mere rendition of a bank statement bearing a notation of the charge for the payment of a check which, in fact, bore a forged indorsement, does not constitute a refusal to pay that amount to the depositor. This appears plainly from the cases involving the statute of limitations. Section 15 of the New York Civil Practice Act, subdivision 2, provides,

"Where a right exists, but a demand is necessary to entitle a person to maintain an action, the time within which the action must be commenced must be computed from

the time when the right to make the demand is complete except in one of the following cases:

\* \* \* \* \*

"2. Where there was a deposit of money not to be repaid at a fixed time but only upon a special demand \* \* \* the time must be computed from the demand."

The case of Tillman v. Guaranty Trust Co., supra, announced the rule that, where a bank has stated unequivocally that the depositor has no valid claim to any deposit, no subsequent demand is necessary and section 15 C.P.A. has no application, with the result that the period of limitation runs from the time of the accruing of the right to relief by action rather than from the time of a subsequent demand.

Despite this rule, the Appellate Division for the First Department, in City of New York v. Fidelity Trust Co. of N. Y., 243 App.Div. 46, 276 N.Y.S. 341, a case where a bank had paid checks bearing forged indorsements and rendered statements showing such payments, held that section 15 C.P.A. applied and that the period of limitation began to run only after a subsequent demand by the depositor. While it is not necessarily true that the period for which interest will be allowed for a breach of contract cannot antedate the time when the period of limitation upon the claim begins to run, these New York cases are conclusive on the interest question. By reason of the wording of section 15 C.P.A. they hold for all purposes that, where a bank has rendered statements showing payments on checks bearing forged indorsements, further demand is necessary "to entitle a person to maintain an action".

■ Plaintiff contends, however, that a circumstance peculiar to this case does entitle the depositor to interest.

The extent of the illicit activities of the depositor's employees was such as to overdraw its account with the bank. The bank thereupon continued to honor checks drawn upon the account and obtain reimbursement from time to time by calls upon the depositor. The depositor states without contradiction that the record shows that none of these overdrafts would have been occasioned had it not been for the improper charges based on checks with forged indorsements. The depositor contends, quite correctly, that the presentation of each check (except presumably those with forged indorsements) constituted a demand upon the bank to make payment out of the deposited funds. It is further argued that when the bank, instead of charging the check against the deposit, treated it as an overdraft and advanced the money to pay it, that constituted a refusal of the demand. The completion of the argument would be that there had been demands in this case to the extent of the amounts represented by properly presented checks and paid by advances made by the bank instead of out of the deposited funds and that those demands had never been satisfied since payment of the checks by advances by the bank constituted a refusal of the demands.

This theory collides head on with the same obstacle which prevents recovery of interest on the amounts of the checks bearing forged indorsements from the dates of their payment. The bank's treatment of payments as overdrafts was nothing more than a bookkeeping entry. Until the bank's failure to comply with the explicit demand of January 19, 1960, there was no assurance that the bank, if the situation had been called to its attention, would not have corrected the bookkeeping entry and treated as charges against the deposit what had previously been denominated as overdrafts on statements rendered to the depositor. The non-observance by the bank of the depositor's order to make a payment out of his deposit and the action of the bank in making the payment out of an advance. even though evidenced by the bank statement submitted to the depositor, do not constitute a repudiation of the bank's obligation to make payment out of deposited funds any more than the payment of a check carrying a forged indorsement

evidenced by the bank statement submitted to the depositor constitutes a repudiation of the bank's obligation to honor the full amount of the deposit without deduction for the payment of the check with the forged indorsement. Since, as the statute of limitations cases indicate, the latter is not a repudiation under New York law, the former is not.

Interest will be allowed only from the date of the demand of January 19, 1960.

## CONCLUSION

Plaintiff is entitled to judgment for the total amount paid out by defendant on checks bearing forged indorsements except those listed on bank statements rendered prior to January 19, 1958, with interest on the total from January 19, 1960.

Settle judgment on notice.