**FIRST NATIONAL BANK OF MEL-
BOURNE, Appellant,**

v.

**SOGAARD & DEBO, INC., Appellee.**

**No. 26069.**

United States Court of Appeals
Fifth Circuit.

Feb. 4, 1969.

Gene H. Godbold, Maguire, Voorhis & Wells, Orlando, Fla., for appellant.

A. E. Carpenter, Jr., Orlando, Fla., H. Rollin Allen, Hand, Kiefer, Allen & Ryan, Detroit, Mich., for appellee.

Before THORNBERRY and AINSWORTH, Circuit Judges, and DAWKINS, District Judge.

DAWKINS, District Judge:

Sogaard & Debo, Inc., (Company) filed this suit against First National Bank of Melbourne (Bank) December 6, 1965, alleging in several counts that checks totaling $70,061.96 drawn on the Company's account had been forged.

After denial of Bank's motion for summary judgment, the case proceeded to trial before a jury September 18, 1967. At the close of the testimony, special interrogatories were referred to the jury. Upon return of the jury's answers to those interrogatories, the trial court entered a final judgment September 22, 1967, awarding $15,433.12 to Company.

Bank then filed a motion for judgment notwithstanding the verdict. The District Court denied that motion in an order entered January 26, 1968.

Presently before us is the appeal from such final judgment and order denying the motion for judgment n. o. v.

In the fall of 1962, Company, a Michigan corporation, opened its branch office in Melbourne, Florida. At about the same time, Company opened a checking account at the Melbourne office of the Bank. The account required the signature of two of the three authorized signatories, William A. Debo, Julius J. Taddie, and Svend Sogaard.

During the time the forged checks in question were issued, Company's Melbourne branch office was managed by Debo. At that time Sogaard, president of Company, resided in Detroit, Michigan. Taddie, treasurer of Company, lived in Melbourne and was a full-time employee with Pan-American World Airways at Cape Kennedy. He devoted a small part of his time to business at the Melbourne branch.

Various occurrences between the latter part of 1963 and March of 1964 caused both Sogaard and Taddie to suspect Debo of making excessive withdrawals. However, neither took any action on the matter, each apparently concluding that the other was approving such alleged salary draws.

In March, 1964, Sogaard, apparently dissatisfied with the Florida branch's profitability, requested that Bank send him the monthly bank statements, together with cancelled checks on the account, for February, 1964, in Detroit. Upon receiving and examining these materials March 6 or 7, 1964, Sogaard found that his name was forged on numerous checks bearing his purported signature along with that of Debo as a co-drawer.

March 9, 1964, Sogaard, in what he described at the trial as a "long conversation" by telephone with Mr. E. A. Infante, a cashier at the Bank, advised the latter of the forgeries. The Bank disputes whether this conversation was sufficient from a legal standpoint to put it on notice as to all of the forgeries in question. Also, March 9, 1964, Company sent a letter confirming the telephone conversation and requesting that Bank honor no further checks on the Company's account.[1]

The record is somewhat hazy as to the events between March, 1964, and March, 1965. There is testimony, however, that the Melbourne office continued to operate under direction of Debo at least for part of that time. The record also reveals that on several occasions Sogaard and Bank communicated, by letter and telephone, with reference to the forged checks.

In March of 1965, Sogaard met with Debo at the office of counsel for company in Detroit. At that time Debo gave Sogaard a large cardbox box containing all of the cancelled checks of the Florida office "from January, 1964, and the first nine months of 1963 and the last three months of 1962." He then disappeared and has not been found since.

Immediately thereafter, Sogaard, Bank, and the attorneys for both conferred in Florida and thoroughly reviewed all of these checks. Numerous forgeries of Sogaard's signature were found among checks purportedly drawn by Sogaard and Debo as co-drawers. In a detailed letter, dated March 15, 1965, Sogaard's attorney advised the Bank as to which checks were forgeries.

Following Bank's refusal of Company's demands upon it for reimbursement of the checks paid on the forged signatures, Company filed this suit December 7, 1965, asking for restitution of $70,061.96.

The precise issues presented by this appeal are: whether the trial court properly instructed the jury on what constitues sufficient notice to a bank of forged checks; whether there was sufficient evidence before the jury for its conclusion that Company gave Bank adequate notice of suspected forgeries of Sogaard's signature on checks issued as far back as one year before March 9, 1964; whether there is sufficient evidence for the jury's conclusion that Bank failed to prove it was not negligent in paying out funds on forged checks; and whether there was sufficient evidence for the jury's conclusion that some, if not many, of the forgeries were not for Company's legitimate business expenses. These issues will be discussed and disposed of, not necessarily seriatim.

▮▮▮▮ Upon careful examination of the record, we hold that the District Court's instructions as to the sufficiency of notice of forgery were proper.

F.S.A. § 659.37 provides:

"Liability of bank for amount paid on forged or raised checks or endorsements.—No bank or trust company, which has paid and charged to the account of a depositor any money on a forged or raised check issued in the name of said depositor, or on a check issued by said depositor bearing a

---

checks, intended for payment of employees of Company.

forged endorsement, shall be liable to said depositor for the amount paid thereon, unless said depositor shall notify the bank or trust company that the check so paid is forged or raised, or that the endorsement thereon is forged, either:

"(1) Within one year after notice to said depositor that the vouchers representing payments charged to his account for the period during which such payment was made, are ready for delivery, or

"(2) If no such notice has been given to the depositor, then within one year after the return to said depositor of the voucher representing such payment, or * * *."

To assure compliance with that statute, the District Court submitted to the jury Special Interrogatory No. 6(a) which states:

"6(a) Has the plaintiff established by the greater weight of the evidence its claims that Svend Sogaard advised the defendant bank on March 9, 1964, that his signature was forged or might have been forged on any of Sogaard & Debo, Inc.'s checks other than those returned with the February, 1964, statement?"

With respect to this Special Interrogatory, the trial court charged the jury as follows:

"In your determination as to whether or not Svend Sogaard did advise the defendant as referred to in Interrogatory 6(a), I instruct you that such advice concerning a claim of forged checks other than those returned with the February 1964, statement need not have been made in writing, but could have been made orally, but in order for the defendant to have been so advised, you must find from the evidence *that the defendant was given sufficient information concerning the claim of forged checks to put the bank in a position to make an investigation with respect to the validity of the claim of*

*forgery as to checks other than those returned with the February 1964 statement.*

"In order for the bank to have been so advised it would not be necessary that Svend Sogaard specified by number and amount and date each individual check claimed by the plaintiff to have a forged signature but in order for the bank to have been advised of the plaintiff's claim you would have to find as to Interrogatory 6(a), *that Svend Sogaard gave the bank sufficient information from which it was reasonably on notice that he claimed substantially all of the checks bearing his signatures on the plaintiff's account were forgeries."* (R. 94–95.) (Emphasis supplied.)

The jury answered Special Interrogatory 6(a) in the affirmative.

Bank argues that the above instructions were erroneous because a proper construction of F.S.A. § 659.37 requires a detailed listing of the allegedly forged checks.

Both Bank and Company concede that the Florida Courts have not decided whether F.S.A. § 659.37, now repealed, required the "strict notice" standard urged by Bank or the "substantial notice" standard urged by Company, and approved by the District Court, in its instructions to the jury.

Had there been relatively few forgeries over a long period of time, see e. g., Flaherty v. Bank of Kimball, 75 S.D. 468, 68 N.W.2d 105 (1955); Indemnity Insurance Company of North America v. Fulton National Bank, 108 Ga.App. 356, 133 S.E.2d 43 (1963), we might agree that "strict notice" would have been required, for then the purpose of the notice requirement—that is, to apprise the Bank of checks for which it possibly would be liable—so that it might investigate the validity of the claims, Indemnity Insurance Company of North America v. Fulton National Bank, supra, would require it.[2]

---

2. See also American Building Maintenance Co. of Calif., Inc., v. Federation Bank & Trust Co., 213 F.Supp. 412 (S.D.N.Y. 1963), where a depositor was seeking to

Here, however, Sogaard apparently was of the opinion that *substantially all,* and so stated to one of the Bank's officers, that *most,* of the checks bearing his signatures were forgeries. It appears to us that such advice to Bank of this fact should have been more than sufficient to satisfy the notice requirement contained in F.S.A. § 659.37. In light of the previously stated purpose of the notice requirement, as illustrated by the plain wording of the Statute, it would have been ridiculous to have required Company to take any additional steps in detailing information about all forged checks bearing Sogaard's purported signature; and we hold that there was sufficient evidence upon which the jury could have based its conclusion that Company advised Bank of the suspected forgeries of Sogaard's signature on checks issued as far back as one year before March 9, 1964.

**■■** An appellate court cannot substitute its judgment for that of the jury where there is basis upon which the jury reasonably could have made its determination. Berry v. United States, 312 U.S. 450, 61 S.Ct. 637, 85 L.Ed. 945 (1941). Clearly, there is ample evidence in the record for the jury to have concluded that, in his telephone conversation with Bank March 9, 1964, Sogaard advised Bank that substantially all of the checks bearing his signature were forgeries.

There is evidence in the record that even prior to March of 1964; Sogaard had reason to suspect Debo of forging Sogaard's signature, e. g., the following colloquy between counsel for Bank and Sogaard:

"Q. So you set up in Detroit and let the boys [Debo and Taddie] in Brevard County [location of Melbourne branch] run their business?

A. Yes. I will say this though, I think in November 1963 Taddie says he talked to me about this, Debo had written himself a check for $500 and then put it back the next day.

For a fleeting moment I thought, 'Well why does he tell me because he must have signed the checks,' but then I just forgot it. I just forgot it. It wasn't unusual if it had happened."

At trial, Taddie testified that early in 1963 he noted that Debo was drawing an amount "that was considerably in excess of what [Taddie] thought he should be drawing to meet expenses." Taddie further testified that he discussed the matter with Sogaard who got "quite upset." Taddie also testified that he and Sogaard discussed how they "could stop it or attempt to stop it."

With this testimony in mind, the jury reasonably could have concluded that when Sogaard received, in March, 1964, Bank's statement, together with checks issued in February, 1964, and discovered that those checks contained numerous forgeries, he probably suspected that such forgeries dated back for at least one year. We disagree, therefore, with Bank's contention that Sogaard's March 9th telephone call to Infante, the Bank's cashier, only could have been with reference to checks drawn in February, 1964.

We also are convinced that the evidence provided wide latitude for jury inferences as to what was said in that conversation. Since the trial was in September of 1967, over three years following that conversation, Sogaard naturally was unable to recall the exact words spoken. He was, however, able to

recover an amount paid by a bank on forged endorsements. In discussing the statutory duty of the depositor to give notice of the forgeries to the bank, the Court said: "It is only when such information is given that a bank is in a position to make an investigation with respect to the validity of a claim that the check has been paid out on a forged endorsement. The statute means what it says when it conditions liability on notification by the depositor to the bank that 'the check' paid bore a forged endorsement."

say the following about that conversation:

"Q. I know this is many years ago and you may not be able to give us an accurate summary or exact words, but to the best of your recollection can you tell us what you said to him and what he said to you?

A. Well, some of it I know. I notified them that I had received a statement the prior Saturday or Friday, whatever it was, and found there was a number of checks that had my name on it but it was not my signature. And we had quite a talk. He was quite upset and I (53) asked him if he knew how long this has been going on. I also asked him if he had any more checks.

Q. Do you recall the answer he gave you to the question 'How long has this been going on?'

A. No.

Q. You can't remember?

A. No, I can't remember that.

Q. I believe you testified you had somethink like an extended conversation with him?

A. Yes, it was quite a long conversation.

Q. By a 'long conversation' do you have any idea how long?

A. I am quite sure it was more than three minutes.

Q. On or about March 12, 1964 did you have an occasion to correspond with the bank?

A. Yes.

Q. Can you tell us what you did on or about March 12th?

A. Well, when we discovered that there was forgery going on we took steps to stop it, and I think when I talked to them finally, that was another thing I asked for, and then we had a meeting, Board of Directors, and new signature card or a new resolution (54) was passed where there was other people or different ones than the other one, or different names, one

anyway, and that was sent to the bank I think on March 12th. From there on, of course, there was no forgery."

Infante testified that he was not sure exactly what was said in that conversation. However, he did remember Sogaard telling him that "he was having some difficulty with the account," and that "he was having problems with his partner, and he thought there was something fishy on the account."

■ We believe that this testimony furnishes at least a quite reasonable basis for the jury's conclusion that the March 9, 1964, telephone call adequately advised Bank of the suspected forgeries.

■ Clearly there was evidence sufficient to support the jury's conclusion that Bank had not proven it was free from negligence. A handwriting expert who testified for Company said the forgeries contained "fundamental and obvious differences"; that "on second glance, or looking at them with any care at all, you can see some very obvious differences"; and that "a laymen with any acquaintance with signatures and signature problems, I think, should have been highly suspicious with the signature on that check with comparison with the signature on the identity card."

Evelyn Ray, a bookkeeper for Bank, testified that in 1963, a February 26, 1963, check bearing the signatures of Sogaard and Debo as co-drawers was presented to her and that she questioned Sogaard's signature. She further testified that the only reason she did not notify Sogaard of the suspicious signature was that Sogaard was living in Michigan, a considerable distance from Melbourne, Florida, Bank's location. Even the testimony of a witness for Bank, Charles Young, was to the effect that normal banking practice in such a situation would be to call Sogaard and verify his signature before paying the check.

■ Since negligence of the depositor relieves the Bank from liability because of payment of a forged check, only where

Bank *additionally* is free from negligence, we need not inquire into the negligence of Company, F.S.A. § 674.25 (Section 23 of the Uniform Negotiable Instruments Act); Huber Glass Co. v. First National Bank of Kenosha, 29 Wis, 2d 106, 138 N.W.2d 157 (1965); Clarke v. Camden Trust Co., 84 N.J.Super. 304, 201 A.2d 762 (1964); Airco Supply Company v. Albuquerque National Bank, 68 N.M. 195, 360 P.2d 386 (1961); Flaherty v. Bank of Kimball, 75 S.D. 468, 68 N.W.2d 105 (1955); Wussow v. Badger State Bank of Milwaukee, 204 Wis. 467, 234 N.W. 720, 236 N.W. 687 (1931); Deer Island Fish & Oyster Co. v. First National Bank, 166 Miss. 630, 146 So. 116 (1933).

■ Finally, we believe there also was adequate evidence in the record to support the jury's conclusion that many of the forgeries were *not* for legitimate business expenses.

The amount of the District Court's ultimate award in this case was based upon liability by the Bank for almost all checks written during the one-year period preceding March 9, 1964, which were payable to Debo and bore the forged signature of Sogaard together with Debo's signature as co-drawer.[3]

Bank contends that the evidence allows but one conclusion, in that *some* of these checks represented payments to Debo for services rendered to Company. To this extent at least, the Bank argues, the Company should not be allowed to recover because no damage or loss was sustained. Florida National Bank at St. Petersburg v. Greer, 96 So.2d 409 (Fla.1957); Bank of Miami Beach v. Newman, 163 So.2d 333 (Fla.App.1964).

■ The burden of proving that checks paid on forged signatures were for legitimate business expenses, of course, was upon Bank. Clearly there was evidence to support the jury's finding that this burden was not met.

While apparently there was tacit agreement that Debo could draw *some* money from the account for his own salary (mentioned as approximately $80.00 per week), there was conflicting evidence on the full extent thereof, and as to when he could make such draws. For example, Sogaard testified that Debo could draw only from the Company's net profits, after expenses, and Bank failed to prove how much, if any profit the Company made during the period of the forgeries in question. Moreover, while the jury well could have concluded that some of the forgeries to such payees as the telephone company and the gasoline company were for legitimate Company business expenses, others were used to pay Debo's personal expenses and thus covered many of his individual obligations, which were not owed by Company.

The jury found that certain of the checks were for legitimate business expenses, and listed these in its special verdict. Moreover, numerous checks, some payable to Debo, were withdrawn from consideration because it was stipulated prior to, or during, trial that these checks *were* for legitimate business expenses. In considering the jury's special findings, we think it is reasonable to assume that it properly inferred that at least some of his payments were by checks found by the jury, or stipulated, to be for such Company business expenses.

---

3. The Company's exhibits 6 and 6A were groups of forged checks totaling $39,-149.45. Exhibit 6, totaling $15,070.93, represented checks payable to Debo. Checks in this exhibit, plus interest, formed the basis for the verdict and judgment below. Exhibit 6A, totaling $24,-078.52, represented checks payable to others than Debo. Prior to trial and after joint investigation, the parties stipulated that many forged checks would not be submitted to the jury because they were used for legitimate business purposes. No claim was made for these checks. Moreover, during trial, some other checks which had been part of Exhibit 6 were withdrawn from consideration as being used for legitimate business expenses.

In short, there was entirely sufficient evidence for the jury to have drawn any number of reasonable conclusions. Therefore, we refuse to disturb its findings on these points.

Accordingly, the final judgment and orders denying the motions for judgment for defendant, and for judgment n. o. v., are

Affirmed.