C. A. SAMMONS, Individually and as Independent Executor of the Estate of Rosine S. Sammons, Deceased, Plaintiff-Appellant,

v.

UNITED STATES of America, Defendant-Appellee.

No. 29227.

United States Court of Appeals, Fifth Circuit.

Nov. 4, 1970.

Rehearing Denied Dec. 15, 1970.

B. Thomas McElroy, White, McElroy & White, Dallas, Tex., for plaintiff-appellant.

Daniel L. Penner, Atty., Tax Div., Department of Justice, Fort Worth, Tex., Martha Joe Stroud, Asst. U. S. Atty., Dallas, Tex., Johnnie M. Walters, Asst. Atty. Gen., Lee A. Jackson, Grant W. Wiprud, John A. Townsend, Attys., Tax Div., U. S. Department of Justice, Washington, D. C., for defendant-appellee; Eldon B. Mahon, U. S. Atty., of counsel.

Before GEWIN, MORGAN and ADAMS *, Circuit Judges.

LEWIS R. MORGAN, Circuit Judge:

In this federal income tax case appellant-taxpayer claims a refund for taxes paid on an alleged constructive dividend which arose when stock was transferred between corporations either owned outright or controlled by the taxpayer. The jury below found that the stock was transferred at a price well below fair market value, and the trial judge entered judgment against the taxpayer. We affirm.

In December of 1957, Sammons, the taxpayer in this contest, became interested in purchasing a multi-wall bag and paper business for sale by Fulton Bag and Cotton Mills Company ("Atlanta Fulton"). As controlling shareholder of several large corporations, Sammons used a rather complicated plan which resulted in his acquisition on January 2, 1958, of the two factories comprising the bag manufacturing operation. This plan may be outlined as follows: American Republic Life Insurance Company, a corporation indirectly controlled by Sammons, purchased the fixed assets while the other assets of the bag business were acquired by Fulton Bag and Products Company ("Texas Fulton") which had as its sole owners five corporations controlled by Sammons.[1] The fixed assets were then leased by American Republic to Texas Fulton which commenced the operation of the multi-wall bag business previously operated by Atlanta Fulton.

On February 11, 1958, the five Sammons' corporations sold their Texas Fulton stock at cost to another Sammons' corporation, Fidelity National Life Insurance Company. At the trial below, Sammons stated that he originally acquired the bag business through the five corporations and then later transferred the business to Fidelity for two principal reasons: First, due to the tight money situation at the time of the initial purchase, Fidelity was unable to come up with enough capital to finance the sale, whereas, the five other corporations in combination easily raised the money. Secondly, the bag business was not retained by the five corporations because Sammons wanted to enlarge Fidelity by allowing it to acquire profitable investments and thus provide a place for executive employees in other parts of the organization who were interested in

---

* Of the Third Circuit, sitting by designation.

1. The five corporations owning Texas Fulton were American Republic Life Insurance Company, Reserve Life Insurance Company, American Security Life Insurance Company, Dearborn Stove Company, and Bennett Printing Company.

managing a small and yet expanding corporation.

Fidelity held its investment until April 2, 1958, when, after lengthy negotiations, the Texas Fulton stock was sold to West Virginia Pulp and Paper Company (Westvaco) for cost plus $556,000 profit. Westvaco purchased the bag business because it had recently developed a technological breakthrough, the Clupac process, whereby stretchable paper could be produced and then made into elastic paper bags. Westvaco hoped to create a consumer demand for their product and thereby force other paper companies to buy the Clupac process on a licensing basis.

Simply stated, the multi-wall bag business progressed through three separate transactions within a time preiod of approximately four months: The business was purchased from Atlanta Fulton by the five Sammons' corporations; it was then sold at cost to another Sammons' corporation; and thirdly, the business was sold at a profit to Westvaco, a company outside the Sammons corporate empire.

The jury's finding, upheld by the district court, was that Fidelity received a bargain purchase from its five brother corporations in that the fair market value of Texas Fulton stock was greater than the amount given by Fidelity. Specifically, the jury concluded that when Sammons caused the stock to be transferred out of the five corporations and into Fidelity, it was worth $500,000 more than Fidelity paid, leaving the taxpayer, Sammons, liable for taxes on this sum as a constructive dividend.

Under Sections 316(a) and 301(c) (1)[2] of the Internal Revenue Code of 1954, dividends to the shareholder must be included in gross income. The dividend may take the form of cash or it may be constructive so that when a shareholder receives property from the corporation at less than fair market value the difference between this sum and the price paid for the property is included in gross income because "such a sale if for substantially less than the value of the property sold, may be as effective a means of distributing profits among stockholders as the formal declaration of a dividend." Palmer v. Commissioner of Internal Revenue, 1937, 302 U.S. 63, 69, 58 S.Ct. 67, 70, 82 L.Ed. 50.

Neither does the dividend escape taxation simply because it fails to pass through the hands of the particular taxpayer when, as in the instant case, the dividend is diverted at the behest of the shareholder into the hands of others. Biltmore Homes, Inc. v. Commissioner of Internal Revenue, 4 Cir., 1961, 288 F.2d 336, cert. den. 368 U.S. 825, 82 S.Ct. 46, 7 L.Ed.2d 30 (1961); Worcester v. Commissioner of Internal Revenue, 1 Cir., 1966, 370 F.2d 713.

In this appeal the main contention advanced by the taxpayer is that the government did not present sufficient evidence from which a jury could make a valid determination as to the fair market value of the Texas Fulton stock. Attention is drawn to the fact that only negotiations were taking place between Sammons and Westvaco at the time the stock was transferred to Fidelity which, taxpayer asserts, renders valueless the testimony by Westvaco's officer that Sammons had made an offer to sell for cost plus $500,000. The evidence that Westvaco actually did buy Texas Fulton for cost plus $556,000 is insufficient according to appellant because this deal was not consummated until 49 days after Fidelity acquired the stock at cost, and also because Westvaco was a compulsive buyer rather than a willing buyer due to its desire to find an outlet for the Clupac process.

---

2. Under Section 316(a), a dividend is defined as "any distribution of property made by a corporation to its shareholders * * * out of earnings and profits to the extent thereof, and from the most recently accumulated earnings and profits".

Section 301(c) (1) then provides that "That portion of the distribution which is a dividend (as defined in section 316) shall be included in gross income".

While the taxpayer has pointed out some apparent reasons for discounting the evidence of fair market value offered by the government, this court must exercise great care lest we go beyond our authority and intrude upon that part of the judicial process which the Constitution [3] has reserved for the jury. This circuit is replete with cases which protect the jury verdict from undue judicial scrutiny [4] and only recently we reaffirmed the long standing test that must be followed when the appeal challenges the sufficiency of the evidence:

"We have said that if there is no evidentiary basis for the jury's verdict, it cannot be permitted to stand, and that the standard for reviewing a jury verdict is whether the state of the proof is such that reasonable and impartial minds could reach the conclusion the jury expressed in its verdict. The jury is, of course, the traditional finder of the facts, and its verdict must stand unless appellant can show that there is no substantial evidence to support it considering the evidence in the light most favorable to appellees, and clothing it with all reasonable inferences to be deducted therefrom. It is not the function of the appellate court, however, to weigh conflicting evidence, judge the credibility of witnesses and arrive at a conclusion opposite from the one reached by the jury, where there is a reasonable basis in the record for the jury's verdict." Liberty Mutual Insurance Co. v. Falgoust, 5 Cir., 1967, 386 F.2d 248, 253.

See also Boeing Company v. Shipman, 5 Cir., 1969, 411 F.2d 365.

Applying these standards and considering the evidence in the light most favorable to the government, it is obvious from a review of the record that there was more than ample evidence upon which reasonable and impartial minds might conclude that the fair market value of Texas Fulton stock was indeed $500,000 greater than the amount paid by Fidelity. The testimony reveals that negotiations for the sale of the bag business began on February 9, 1959, when Mr. Birkelund, a director of Westvaco, met Mr. Sammons in Chicago and was informed by Sammons that the bag manufacturing operation could be purchased for cost plus one-half million dollars. This meeting occurred before the transfer at cost of the Texas Fulton stock to Fidelity and the negotiations continued until a final agreement was reached on April 2, 1958, whereby Westvaco did in fact pay Sammons according to the terms of the initial Chicago meeting.

The taxpayer replies to these facts by citing cases [5] for the proposition that mere offers of purchase or sale do not constitute evidence of probative force as to fair market value. The record, however, shows that the jury had more than mere offers upon which to base their verdict. There were continuous negotiations between Sammons and Westvaco resulting in a contract which coincided precisely with the terms set by the taxpayer before he transferred the stock from one segment of his corporate organization to another. Looking to the testimony concerning the negotiations both before and after the sale to Fidelity and to the fact that a contract was signed four months later embodying the basic terms of such negotiations, we find the record easily sustains the jury's conclusion that fair market value was the amount stated by the taxpayer himself in his original discussion with Westvaco in Chicago.

3. United States Constitution, Amendment VII.

4. First National Bank of Melbourne v. Sogaard and Debo, Inc., 5 Cir., 1970, 406 F.2d 1128; Gulf Oil Corporation v. Griffith, 5 Cir., 1964, 330 F.2d 729. Jones & Laughlin Steel Corporation v. Matherne, 5 Cir., 1965, 348 F.2d 394.

5. Sharp v. United States, 1903, 191 U.S. 341, 24 S.Ct. 114, 48 L.Ed. 211; St. Joe Paper Co. v. United States, 5 Cir., 1946, 155 F.2d 93; United States v. Smith, 5 Cir., 1966, 355 F.2d 807.

As to the contention that the Clupac process which Westvaco desired to promote gave it a special need for a paper bag plant and thus rendered the purchaser a compulsive buyer not worthy of testifying on the question of fair market value, we find little merit. Several cases are referred to which hold that the purchaser was a compulsive buyer because he was under a statutory duty to purchase [6] or because the desire for a tax saving motivated the higher than normal price [7] or because the purchase was made at a foreclosure sale.[8] However, the degree of pressure on the buyer in this line of cases differs markedly from that which motivated Westvaco. Westvaco simply had a valid business reason for acquiring a bag plant and there is no evidence in the record that the company was forced to buy from Sammons and that it could not have gone elsewhere and purchased a similar factory. Stated differently, the only force compelling the buyer in this case was a desire on their part to make a profit, and we can find no decision where such a factor, standing alone, has excluded testimony on fair market value.

■ The taxpayer further contends that under Palmer v. Commissioner of Internal Revenue, supra, he did not receive a constructive dividend because the stock sale was not intended as a distribution of earnings to the shareholder. This is an erroneous view of Palmer for intent to distribute corporate earnings is not a universal requirement for a finding that a constructive dividend has been paid. Waldheim v. Commissioner of Internal Revenue, 7 Cir., 1957, 244 F.2d 1; cf. Commissioner of Internal Revenue v. Gordon, 1968, 391 U.S. 83, 88 S.Ct. 1517, 20 L.Ed.2d 448, where the Supreme Court recently decided that a constructive dividend existed and yet made no mention of an intent to distribute earnings.

We have considered the taxpayer's claim that Birkelund's (Westvaco director) oral testimony concerning the content of two letters should have been excluded as hearsay and, without deciding the hearsay issue, we reject this claim. The taxpayer has not demonstrated and from a search of the record we are unable to conclude that the testimony was other than harmless error even if it was in fact erroneously admitted.

We also reject the taxpayer's contention that his motion for directed verdict should have been granted on the ground that the five corporations were mere agents of Fidelity. The existence of an agency relationship was not presented to the trier of fact [9] and the state of the record is not such as would permit a finding on our part that reasonable minds could not have differed on this factual matter.

In conclusion, we hold that Mr. Sammons received a constructive dividend when he moved the paper bag business between wholly-owned or controlled corporate entities at a price which the jury reasonably concluded to be one-half million dollars below fair market value. In reality then, the taxpayer took money from his five corporations and placed it in a sixth. It is of little consequence that he personally received no money from the transaction, for it is the power to dispose of income and the exercise of that power that determines whether taxable income has been received. Helvering v. Horst, 1940, 311 U.S. 112, 61 S.Ct. 144, 85 L.Ed. 75; Floyd v. Scofield, 5 Cir., 1952, 193 F.2d 594.

Affirmed.

---

6. Howell v. United States, 7 Cir., 1969, 414 F.2d 45.

7. Goldstein v. Commissioner of Internal Revenue, 9 Cir., 1962, 298 F.2d 562.

8. Helvering v. New President Corporation, 8 Cir., 1941, 122 F.2d 92.

9. As both parties concede, the agency relationship is a question of fact which, in the absence of a requested instruction on this matter in the trial court or a finding by this court that reasonable minds could not differ as to the existence of the relationship, may not be raised on appeal. Cf. Martin v. United States, 5 Cir., 1968, 393 F.2d 92; Pan-American Life Insurance Co. v. Alvarez, 5 Cir., 1967, 374 F.2d 92.