CLAYTON E. GREENFIELD AND CARMEN F. GREENFIELD, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

FRED S. BUGG AND PAULINE C. BUGG, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 5516–67, 5530–67. Filed June 13, 1973.

*Edward A. Kaufman*, for the petitioners.
*J. Patrick McElroy*, for the respondent.

TANNENWALD, *Judge:*\* Respondent determined the following deficiencies for 1964 in these consolidated cases:

| Docket No. | Petitioners | Deficiency |
|---|---|---|
| 5516–67__ | Clayton E. Greenfield and Carmen F. Greenfield | $43, 264. 00 |
| 5530–67__ | Fred S. Bugg and Pauline C. Bugg | 34, 594. 56 |

The only question presented is whether each petitioner [1] is properly chargeable with $100,000 of income as a result of an alleged increase in the investment of their controlled foreign corporation in U.S. property; alternatively, respondent asserts that each petitioner received a $100,000 dividend from their controlled foreign corporation.

### FINDINGS OF FACT

Some of the facts have been stipulated and are incorporated herein by reference.

The parties in these cases filed joint returns for the 1964 calendar year with the district director of internal revenue, Jacksonville, Fla.;

---

\*Pursuant to a notice of reassignment sent to counsel for all parties, and to which no objections were filed, these cases were reassigned by the Chief Judge on Dec. 11, 1972, from Judge Austin Hoyt to Judge Theodore Tannenwald, Jr., for disposition.

[1] Carmen F. Greenfield and Pauline C. Bugg are parties herein solely because they filed joint returns with their husbands for the year in question. Any references to petitioner or petitioners refer to Mr. Greenfield and Mr. Bugg only.

they resided in Dade County, Fla., at the time the petitions herein were filed.

At all times pertinent herein, Clayton E. Greenfield (hereinafter Greenfield) and Fred S. Bugg (hereinafter Bugg) each owned 50 percent of Carline Electric Corp., a Florida corporation formed in 1957 and henceforth referred to as Domestic, and Carline Ltd., a Bahamian corporation formed in 1958 and henceforth referred to as Offshore. At all times relevant herein, Offshore was a controlled foreign corporation under section 957.[2] Both corporations were engaged in the electrical-contracting business and related activities, Domestic in the United States and Offshore in and around the Bahamas and Bermuda. The officers of Domestic were as follows: Greenfield, president; Bugg, vice president; Carmen F. Greenfield, secretary-treasurer. Bugg was also vice president of Offshore.[3]

Domestic provided a number of services to Offshore including procuring materials and manpower and preparing estimates which Offshore utilized in formulating bids.[4]

It was tacitly understood that Domestic would procure any materials needed for Offshore's operations. Domestic charged Offshore cost plus 15 percent for goods and services in 1964; in earlier years, the additional charge was 5 to 10 percent. Offshore customarily advanced sums to Domestic in order to permit the latter to take advantage of discounts for cash purchases, prepay freight charges, and pay customs duties in order to receive materials from the docks.

Transactions between the two corporations were reflected in an open account maintained by each corporation on its books. For Offshore's fiscal years ended August 31, 1959, through August 31, 1965, the accounts reflect the following:

| FYE Aug. 31— | Open balance in favor of Domestic | Amounts billed to Offshore by Domestic | Amounts paid to Domestic by Offshore | Closing balance in favor of Domestic [1] |
|---|---|---|---|---|
| 1959 | $85,938 | $64,516 | $136,072 | $14,382 |
| 1960 | 14,382 | 145,787 | 161,996 | (1,827) |
| 1961 | (1,827) | NA | NA | (41,208) |
| 1962 | [2] (41,208) | NA | NA | (95,342) |
| 1963 | (95,342) | 41,881 | 10,595 | (64,056) |
| 1964 | (64,056) | 128,098 | 158,056 | (94,014) |
| 1965 | (94,014) | 98,804 | 100,025 | (95,235) |

[1] Figures in parentheses indicate that the balance is in favor of Offshore.
[2] On Dec. 31, 1962, the account had a balance of $95,465 in favor of Offshore.

This account did not bear any interest.

[2] All Code references are to the Internal Revenue Code of 1954, as amended and in effect during the year in issue.

[3] The record is silent as to the identity of Offshore's other officers.

[4] The preparation of estimates and procurement of manpower for Offshore's operations was done by Bugg and Greenfield, who traveled to the Bahamas as the need arose.

Offshore's earnings and profits totaled $167,296 [5] and $241,545.56 as of August 31, 1963, and August 31, 1964, respectively.

In 1964, Domestic was the successful bidder on an electrical-contracting job for the U.S. Navy at Key West, Fla. Under the terms of the contract, a performance bond was required. Domestic sought to obtain one from Travelers Insurance Co. (Travelers). Normally, both corporations and all four petitioners subjected themselves to liability on a bond issued for either Offshore or Domestic. In this instance, Travelers insisted that Domestic increase its paid-in capital account by $100,000 and that Offshore subordinate $100,000 of the open-account indebtedness to Travelers' bond. These requirements were met through the two transactions hereinafter described.

### First Transaction

In July 1964, Domestic by corporate resolution authorized the issuance to Bugg and Greenfield of 50 shares each of preferred stock at $1,000 per share.[6] Similar authorization is contained in an undated extract of minutes signed by its secretary (Carmen F. Greenfield) and president (Greenfield), which also recites an indebtedness of $50,000 each to Greenfield and Bugg. The stock was not issued. On or about July 8, 1964, Offshore drew two checks of $25,000 each, payable to Bugg and Greenfield, respectively. They endorsed the checks and on July 10 the checks were deposited in Offshore's Miami checking account. Then, on July 16, the money was transferred to Domestic's account. On August 1, 1964, Offshore drew a $50,000 check payable jointly to Bugg and Greenfield; this check was deposited directly into Domestic's account on August 10, 1964. Two notes of $50,000 each were drawn in favor of Bugg and Greenfield, respectively, backdated to December 1, 1963.[7]

Domestic kept its books and records and filed its tax returns on the basis of a fiscal year ending July 31. Schedule E (compensation of officers) of the fiscal 1964 Federal income tax return of Domestic showed that it had preferred stock issued with 50 percent being owned by Bugg and 50 percent by Carmen F. Greenfield. Schedule L (balance sheets) of that return showed $100,000 of preferred stock as of the close of the taxable year as compared with zero at the beginning of the taxable year.

Schedule E (compensation of officers) of the fiscal 1965 Federal income tax return of Domestic showed that it had preferred stock

---

[5] For ought that this record discloses, the figure represents earnings and profits accumulated after Dec. 31, 1962.

[6] The evidence submitted consists of an unsigned copy of a resolution, dated July 9, 1964.

[7] The notes submitted in evidence were unsigned.

issued, with 46.91 percent owned by Greenfield and 46.91 percent owned by Bugg.[8] Schedule L (balance sheets) of that return showed zero preferred stock at both the beginning and the end of the taxable year.[9]

On or about January 13, 1965, Domestic issued two $45,000 checks to Bugg and Greenfield, respectively. On January 14, they deposited these checks in Offshore's Canadian account, and then immediately deposited them back into Domestic's Miami account. The redeposit of the moneys to Domestic's account was allegedly due to that corporation's financial instability due to its failure to make a profit on the Key West job.

## Second Transaction

As of July 31, 1964, Domestic carried a balance in favor of Offshore in the amount of $94,129.53. In order to meet the subordination requirements of Travelers, that account was charged with $100,000, leaving a debit balance in favor of Domestic of $5,870.47. No money actually changed hands, but an unsigned, non-interest-bearing promissory note for $100,000 in favor of Offshore, subordinated to Travelers' bond, and payable on demand only upon approval from Travelers, was created, also backdated to December 1, 1963.[10]

Schedule L (balance sheets) of Domestic's Federal income tax returns for fiscal 1964 and 1965 showed the following:

MORTGAGES, NOTES, AND BONDS PAYABLE IN LESS THAN 1 YEAR

| Year | Beginning of year | Ending of year |
|------|---|---|
| 1964 | 0 | $2, 638 |
| 1965 | $2, 638 | 32, 696 |

MORTGAGES, NOTES, AND BONDS PAYABLE IN 1 YEAR OR MORE

| Year | Beginning of year | Ending of year |
|------|---|---|
| 1964 | 0 | $100, 827 |
| 1965 | [11] $200, 827 | [11] 200, 000 |

## OPINION

The focus of this case is the provisions of subpart F of part III, subch. N, ch. 1, I.R.C. Although we fortunately are relieved of the necessity of dealing herein with many of the complexities of those

[8] The record contains no explanation for the variations between this information and that contained in Schedule L of the fiscal 1964 return.

[9] See fn. 11 *infra.*

[10] This date was apparently used because the open account balance at that time was at least $100,000 in favor of Offshore.

[11] It seems clear that this figure includes the amount of the "subordinated loan" and the amount which had previously been treated as "preferred stock." See pp. 427–428 *supra.*

provisions, we are nevertheless reminded of Judge Learned Hand's telling remarks, in commenting on the income tax act:

In my own case the words of such an act *-* * merely dance before my eyes in a meaningless procession: cross-reference to cross-reference, exception upon exception—couched in abstract terms that offer no handle to seize hold of—[leaving] in my mind only a confused sense of some vitally important, but successfully concealed, purport, which it is my duty to extract * * * [12]

Having, we think, penetrated the veil of confusion, we proceed to discharge our duty of extraction. Our starting point is section 951, which in relevant part provides as follows:

SEC. 951. AMOUNTS INCLUDED IN GROSS INCOME OF UNITED STATES SHAREHOLDERS.

(a) AMOUNTS INCLUDED.—

(1) IN GENERAL.—If a foreign corporation is a controlled foreign corporation for an uninterrupted period of 30 days or more during any taxable year beginning after December 31, 1962, every person who is a United States shareholder (as defined in subsection (b)) of such corporation and who owns (within the meaning of section 958(a)) stock in such corporation on the last day, in such year, on which such corporation is a controlled foreign corporation shall include in his gross income, for his taxable year in which or with which such taxable year of the corporation ends—

*       *       *       *       *       *       *

(B) his pro rata share (determined under section 956(a)(2)) of the corporation's increase in earnings invested in United States property for such year (but only to the extent not excluded from gross income under section 959(a)(2)).

The parties agree that Offshore was a controlled foreign corporation (as defined in section 957(a)) during fiscal year 1964 and that petitioners were U.S. shareholders as that term is used in section 951(a) (and defined in section 951(b)). Their positions are polarized, however, on whether Offshore had any of its earnings invested in U.S. property as a result of the two transactions in question totaling $200,000.

Section 956(a)(1) defines the amount of earnings invested in U.S. property as the total amount of such property held by the foreign corporation at the close of its taxable year to the extent such amount would have constituted a dividend if it had been distributed. Since Offshore's earnings and profits as of August 31, 1964, exceeded $200,000, all of the distribution of the amounts allegedly invested in U.S. property would have constituted a dividend. The increase in earnings invested in U.S. property in any 1 year is determined by subtracting the earnings invested in U.S. property at the close of the preceding year from that of the current year. Sec. 956(a)(2).

12 Hand, "Thomas Walter Swan," 57 Yale L.J. 169 (1947).

Section 956(b)(1)(C) defines the term "United States property" as property acquired after December 31, 1962, including, among other things, "an obligation of a United States person." [13]

Section 956(b)(2)(C) provides the following exception:

(C) any obligation of a United States person arising in connection with the sale or processing of property if the amount of such obligation outstanding at no time during the taxable year exceeds the amount which would be ordinary and necessary to carry on the trade or business of both the other party to the sale or processing transaction and the United States person had the sale or processing transaction been made between unrelated persons;

Section 1.956-2(d)(2), Income Tax Regs., defines the term "obligations" as including any "note, * * * account receivable, note receivable, open account, or other indebtedness, whether or not issued at a discount and whether or not bearing interest," except that it does not include indebtedness "arising in connection with the sale or processing of property" nor does it include indebtedness which either "is collected within one year from the time it is incurred" or "Matures within one year from the time it is incurred but is not collected within such period solely by reason of the inability or unwillingness of the debtor to make payment within such period."

We deal first with the transfer of funds by Offshore in the aggregate amount of $100,000 in July and August 1964, i.e., the first transaction. These funds, as shown by our findings of fact, were funneled from Offshore to Domestic via checks of Offshore to Greenfield and Bugg, half of which was promptly deposited by them in Offshore's Miami account and transferred from that account to Domestic and the other half of which was transferred directly to Domestic. The record herein is confusing as to the precise relationship of Greenfield, Bugg, and Offshore to the obligation of Domestic created by these transfers. Given the fact that petitioners have the burden of proof and the evidence indicating that an indebtedness from Domestic to Greenfield and Bugg was apparently created through the use of Offshore's funds, it would be possible to conclude that Greenfield and Bugg in fact received a dividend distribution from Offshore. But the parties have treated the transaction as taking place between Offshore and Domestic and we accept that treatment for purposes of decision herein. In this context, we conclude that it is unnecessary for us to determine whether the transfer of funds by Offshore represented payments for preferred stock, a contribution to capital, or a loan. Whichever of these characterizations is adopted, we conclude that these funds were invested in U.S. property within the meaning of sections 951(a)(1)(B) and 956. In this connection, we note that only a preferred stock or capital con-

---

[13] It is not denied that Domestic and petitioners are U.S. persons. See sec. 957(d) and sec. 7701(a)(30).

tribution would have satisfied one of the two conditions of the issuance of the Travelers' bond, and we are loath, on the basis of the confusing state of the record herein, to accept the contrary assertion by petitioners, which would on its face constitute a holding that such condition was violated. Cf. *David F. Bolger*, 59 T.C. 760 (1973). Moreover, Domestic's corporate records contain indications that the issuance of preferred stock in exchange for these funds was at least contemplated.

But, assuming *arguendo* that the funds were intended from the outset to be a loan from Offshore to Domestic, we are satisfied that such "loan" would not fall within the exceptions provided by section 956(b) or the regulations issued thereunder. There is no evidence in this record to indicate what the terms of such a "loan" were, so we cannot find that it was to mature within 1 year. Nor can we say that it was collected within 1 year. To be sure, there were checks totaling $90,000 issued by Domestic to Greenfield and Bugg in January 1965 purportedly in payment of the funds so advanced, and these checks were promptly deposited in an Offshore bank account. But they were immediately redeposited in a Domestic bank account. Under these circumstances, such "payment" was illusory and should properly be disregarded. Moreover, even if we were to assume that such "loan" was intended to mature within 1 year, we cannot say, on the basis of the record before us, that Domestic was unable or unwilling to pay within the meaning of section 1.956–2(d)(2), Income Tax Regs. Despite the claim of financial instability, the balance sheet of Domestic as of July 31, 1965, shows assets in excess of liabilities (other than such "loan") including some $58,000 of cash in an amount more than sufficient to provide for payment if Offshore had insisted on payment.[14]

As far as section 956(b)(2)(C) is concerned, we are satisfied that it is inapplicable to the first transaction. Certainly, under the conditions established by Travelers, the funds represented by such "loan" could not have been used to pay for property purchased for, or services furnished to, Offshore by Domestic. Nor does this record furnish a sufficient basis for concluding that the making of such "loan" was so related to Offshore's activities that it can be said that it was made "in connection with the sale or processing" of other property by Domestic which was "ordinary and necessary to carry on the trade or business" of Offshore. Cf., e.g., *Commissioner* v. *Bagley & Sewall Co.*, 221 F. 2d 944 (C.A. 2, 1955); *University Properties, Inc.*, 45 T.C. 416, 423 (1966), affd. 378 F.2d 83 (C.A. 9, 1967).

[14] Such excess would not exist if the $100,000 represented by the second transaction were counted, but this account could not be paid without Travelers' consent and there is no indication that any such consent was requested or obtained. See p. 428 *supra* and pp. 433–434 *infra*.

We hold that the funds represented by the first transaction constituted an increase in the earnings of Offshore invested in U.S. property and are accordingly taxable to petitioners under the provisions of section 951(a).

We now turn to the $100,000 represented by the subordination of an obligation in the form of a note from Domestic to Offshore in order to meet the second condition imposed by Travelers. The origin of the note is clear—an open account purportedly representing advance payments for materials and services supplied to Offshore by Domestic. Petitioners' basic argument is that the transactions represented by these activities fall within the exception contained in section 956(b)(2)(C) on the ground that they arose in connection with the sale or processing of property and were in an amount which was ordinary and necessary to the carrying on of Domestic's and Offshore's trade or business. As a consequence, petitioners assert that the $100,000 involved should not be regarded as "United States property." Respondent's argument appears to have two prongs: (a) That the amount in the open account immediately prior to the issuance of the subordinated note fell within the exception of section 956(b)(2)(C), and (b) that the issuance of such note so changed the character of the relationship between Offshore and Domestic that the exception of section 956(b)(2)(C) no longer applied to the note obligation and the note should therefore be held to constitute an investment in U.S. property. The net result of respondent's position is that, in terms of this transaction, Offshore's investment in "United States property" increased from zero as of August 31, 1963, to $100,000 as of August 31, 1964.

We wend our way to decision via a different route from that advanced by either party. We disagree with respondent that, under the circumstances of this case, the obligation represented by the subordinated note can be separated from the open account out of which it arose and from the transactions reflected in that account. This is not to say that there may not be situations in the future where the terms, conditions, and nature of an obligation which would have otherwise been entitled to the benefit of the section 956(b)(2)(C) exception are so changed in character as to require the conclusion that the obligation should no longer be entitled to the benefit of that exception, with the result that it should be treated in its entirety as an investment in "United States property." It is enough for us to note that we do not think such a change occurred in this case.

On the other hand, on the basis of the record before us, we are not convinced that the balance in favor of Offshore should be treated as falling within the exception contained in section 956(b)(2)(C). We recognize that there were business reasons for Offshore to advance funds to Domestic on account of the acquisition of goods and services,

but we fail to perceive why such reasons made it "ordinary and necessary" to Offshore's business to provide such funds in such amounts that there was always a substantial balance in Offshore's favor at the end of each of its fiscal years commencing with the year ending August 31, 1961.[15] We think it more reasonable to conclude, on the basis of this record, that such excess advances were at least in some part for the purpose of providing Domestic with financing which it needed for its own activities. Finally, for the reasons stated in our discussion of the first transaction, we find this record insufficient to support the conclusion that such financing was "ordinary and necessary" to the carrying on of Offshore's business. See p. 431 *supra.*

Section 956(b)(2)(C) provides that U.S. property does not include "any obligation of a United States person * * * if the amount of such obligation outstanding *at no time during the taxable year* exceeds the amount which would be ordinary and necessary." (Emphasis supplied.) Since we believe the indebtedness of Domestic to Offshore was unreasonable in some part, it would appear that the statute requires that the entire amount of the indebtedness be disregarded for the purposes of section 956(b)(2)(C). But this does not dispose of the matter because, although the consequence of such a rationale is to characterize the entire indebtedness as "United States property," section 956(b)(1) includes in that term only property acquired after December 31, 1962. On that date, the indebtedness in question was $95,465. On August 31, 1963, it was a lesser amount, namely $64,056. We think it can fairly be said that, under the circumstances of this case, $64,056 of the indebtedness was invested in U.S. property prior to December 31, 1962, and should therefore not be counted. If this amount is excluded, the difference of $29,958 ($94,014 as of August 31, 1964, less $64,056) constituted an increase in earnings of Offshore invested in "United States property" during fiscal 1964.

Nor do we think that this amount can be excluded under the collection or 1-year maturity provisions of section 1.956–2(d)(2), Income Tax Regs. The record does not convince us that there was actual repayment and, in fact, any attempt to repay on Domestic's part would have been in violation of the terms of the note,[16] since there is no evidence that Travelers was ever requested to consent, or consented, to

---

[15] In making this statement, we have accorded unitary treatment to the open account and the subordinated notes.

The legislative history of sec. 956(b)(2)(C) indicates that the exception was designed to encompass "normal commercial transactions without any intention to permit the funds to remain in the United States indefinitely." See H. Rept. No. 1447, 87th Cong., 2d Sess., p. 65 (1962), 1962–3 C.B. 469.

[16] The terms of the note, combined with the customary practice of Offshore to provide funds in advance to Domestic, indicate that the amounts billed by Domestic to Offshore and paid by Offshore to Domestic during fiscal 1965 were for current transactions arising in that year.

such repayment.[17] Similarly, the need for that prior consent inhibits any conclusion that the subordinated note matured within 1 year. Finally, our views as expressed in relation to the first transaction are dispositive as far as the inability or unwillingness to pay on Domestic's part or any attempt to treat the January 1965 transactions as payment on account of this item are concerned. The same is true in respect of any assertion that the giving of the subordinated note was "ordinary and necessary." See p. 433 *supra*.

In short, we hold that, to the extent of $29,958 of the second transaction, Offshore increased its invested earnings in "United States property" during fiscal 1964 and that the amount is accordingly taxable to petitioners under section 956(a).[18]

Respondent has also sought to tax the full $200,000 to petitioners on the theory that they received a constructive dividend in this amount from Offshore. As to the $100,000 involved in the first transaction, since we have held that this amount is taxable to petitioners as an investment of earnings by Offshore in "United States property," it is unnecessary to resolve the constructive-dividend issue. We are constrained to note, however, that petitioners were apparently entitled to receive preferred stock (and may have received notes) for that $100,000 and that these circumstances might well be held to justify the conclusion that the funds were siphoned off from Offshore for their personal benefit. Cf. *Sammons* v. *Commissioner*, 472 F. 2d 449 (C.A. 5, 1972), affirming, reversing, and remanding a Memorandum Opinion of this Court; *Sammons* v. *United States*, 433 F. 2d 728 (C.A. 5, 1970) ; *Sparks Nugget, Inc.* v. *Commissioner*, 458 F. 2d 631 (C.A. 9, 1972), affirming a Memorandum Opinion of this Court; *Worcester* v. *Commissioner*, 370 F. 2d 713 (C.A. 1, 1966), affirming in part and reversing in part a Memorandum Opinion of this Court; *Equitable Publishing Co.* v. *Commissioner*, 356 F. 2d 514 (C.A. 3, 1966), affirming a Memorandum Opinion of this Court; *Glenn E. Edgar*, 56 T.C. 717, 758 (1971) ; *George R. Tollefsen*, 52 T.C. 671, 681 (1969), affd. 431 F. 2d 511 (C.A. 2, 1970). As to the $100,000 involved in the second transaction, we are unable to perceive such personal benefit to petitioners as would justify constructive-dividend treatment. The funds involved remained in corporate solution and we are satisfied that they were to be repaid by Domestic to Offshore and not to petitioners. Cf. *John D. Gray*, 56 T.C. 1032 (1971) ; *W. B. Rushing*, 52 T.C. 888, 894 (1969), affirmed as to other issues 441 F. 2d 593 (C.A. 5, 1971).[19] The mere facts that peti-

---

[17] See fn. 14 *supra*.

[18] We would reach the same result if we treated the entire account (including the subordinated note) as constituting an investment in U.S. property, since the amount to be treated as income to petitioners would be the difference between the balance in that account at the end of fiscal 1963 and at the end of fiscal 1964. See sec. 956(a)(2).

[19] See also *Joseph Lupowitz Sons, Inc.*, T.C. Memo. 1972–238.

tioners may have been guarantors of the bond (as to which the record is unclear) and that the subordination by Offshore of Domestic's obligation to it may eventually have benefited them are not, in our opinion, sufficient to sustain a determination that that subordinated obligation in and of itself should be considered a dividend.

*Decisions will be entered under Rule 50.*